16206

WILSON v. ETHEREDGE *ET AL.*
(52 S. E. (2d) 812)

*Mr. J. Perrin Anderson*, of Greenwood, *for Appellant*,

*Messrs. A. J. Hydrick, Sr.* and *P. L. Felder, Jr.*, of Orangeburg, and *L. M. Gressette*, of St. Matthews, *for Respondent*.

April 5, 1949.

FISHBURNE, Justice.

This appeal brings up for review the validity of a claim filed by the appellant, Paul B. Wilson, against the receivers of the estate of L. K. Etheredge, who died March 11, 1947. Payment of the claim which amounted to $1,648.35 was refused by the receivers, and the matter was referred to a special referee, who after hearing the evidence, rejected certain items. He recommended that the balance of $611.87 should be paid as constituting a valid claim against the estate. Upon exceptions being taken by both parties to the circuit court, that court disallowed the claim in its entirety.

The amount involved in this litigation is the value of certain tools and items of machinery, the property of appellant, which it is charged were under the control and in the pos-

session of L. K. Etheredge as a gratuitous bailee. It is argued that the estate should be held liable for their loss because the legal relationship of the parties was that of bailor and bailee. No formal pleadings were filed in the proceeding.

The circuit judge in reversing the special referee held that under the evidence no bailment was created, but that Wilson and Etheredge entered into a limited partnership from which no liability arose with reference to the machinery.

The first question for determination is: What was the nature of the bailment, if one existed? The issue arises under the following circumstances:

The appellant, Wilson, for many years prior to 1936, operated a machine shop in the city of Greenwood, South Carolina, and was also an inventor of various mechanical devices, on some of which he obtained patents. L. K. Etheredge resided about three miles from North, in Orangeburg County, and in addition to conducting large farming interests, was engaged in the operation of a sawmill, cotton gin, and other business enterprises. Prior to the events giving rise to this cause of action, he had employed Wilson on various occasions to come down to North from his home at Greenwood, to install and repair machinery.

Wilson conceived the idea of inventing a "magnetic loom" for the weaving of cloth which would eliminate the noise incident to the operation of looms. He interested Etheredge in the project and a written agreement was entered into between them during the year 1936, under the terms of which Etheredge was to furnish certain money to defray the cost of applying for Letters Patent on the magnetic loom, and was to participate in any profits which might be made from the sale of the loom or the patent rights, to the extent of one-half. This patent was obtained in 1938.

The loom, however, was still not perfected sufficiently for successful operation, and it was agreed between Wilson and Etheredge that Wilson would continue his work in an effort

to perfect the loom so as to get it in commercial production. Pursuant to this agreement, which was verbal, Wilson was to furnish the tools and machinery which would be needed in fully developing the invention, and Etheredge was to provide the money for buying necessary material and for other expenses, such as electric current for operating the machinery used by Wilson in his work.

The machinery in question, an itemized list of which was filed with the receivers, was owned by Wilson and had been in his possession several years prior to the time he and Etheredge entered into their agreement. It was moved from Wilson's machine shop in Greenwood in trucks furnished by Etheredge, to a shop located about 200 feet behind the residence of Etheredge at North.

Wilson would, from time to time, go to North from his home at Greenwood, eighty miles away, to work on the loom in this shop on the premises of Etheredge. The work was not constant because of the difficulty of obtaining materials, but this intermittent work was performed by Wilson during the years 1939, 1940 and 1941. Some time in the year 1941, Wilson sustained serious bodily injuries and was confined in a hospital and at his home for more than a year, which prevented his performing any active labor. Meanwhile his machinery remained in the Etheredge shop at North.

Wilson testified that about one year prior to the death of Etheredge, which occurred March 11, 1947, he went to see him at his home. Etheredge was recuperating from an illness at the time and was confined to the house. At this meeting they discussed the invention, and Etheredge told Wilson that he was not willing to put any more money into the enterprise. Wilson wished to get his machinery from the Etheredge shop in the yard and Etheredge told him he could get it, but that he (Etheredge) was not in shape to attend to it. Consequently, the machinery and tools remained in the custody and under the control of Etheredge. While Wilson had free access to the shop on the occasions when he worked on

the loom, he had no key to the building, and he never got possession of his machinery.

Mr. Houser, one of the receivers of the Etheredge Estate, testified that when he was appointed receiver he made a complete inventory of the estate, but found no machinery in any way answering the description of the articles listed by Wilson. Witnesses for the respondents admitted, however, that machinery belonging to Wilson had been placed in the Etheredge shop. No testimony was offered or explanation made as to what became of the machinery.

The special referee held that the evidence showed the creation of a bailment between Wilson and Etheredge for their mutual benefit, profit and advantage, and that as bailee, Etheredge had the duty of exercising reasonable care in preserving Wilson's machinery, which duty he failed to perform.

We think that there can be no doubt under the evidence, that a bailment was created for the mutual benefit of the parties, and continued as such until terminated by Etheredge when he withdrew from the agreement and refused to invest any more money in the project.

The next question is: What was the relationship of the parties after the bailment for their mutual benefit ceased to exist? We think that it was still that of bailor and bailee, and that Etheredge became a gratuitous bailee of Wilson's machinery. While it is generally held that a gratuitous bailee is liable only for "gross negligence," so far as the failure to exercise care is concerned, very few courts have attempted a definition of the term. *McLaughlin v. Sears, Roebuck & Co.,* 188 S. C. 358, 199 S. E. 413; *Spencer v. First Carolinas Joint Stock Land Bank,* 167 S. C. 36, 165 S. E. 731. And see Annotations, 4 A. L. R. 1196, 96 A. L. R. 909.

Various interpretations have been given the expression "gross negligence" in this class of cases. Primarily, gross negligence connotes the failure to exercise a slight degree of care. But in the well considered case

of *McLaughlin v. Sears, Roebuck & Co., supra,* which involved a gratuitous bailment of certain automobile tires on the part of a garage operator, the expression "gross negligence" was held to denote the failure to exercise reasonable care, which conclusion we think is supported by the current weight of authority and the weight of reason.

> As was said in *McLaughlin v. Sears, Roebuck & Co.* [188 S. C. 358, 199 S. E. 415], quoting with approval from 6 Am. Jur., Sec. 253, Page 341:

" * * * probably none will dissent from the proposition, supported expressly by an increasing number of the modern authorities, that in every case good faith requires a bailee without reward to exercise reasonable care; and what is reasonable care must materially depend upon the nature, value, and quality of the thing bailed, its liability to loss and injury, the circumstances under which it is deposited, and sometimes upon the character and confidence and particular dealings of the parties. * * *"

It was likewise pointed out in the *McLaughlin case,* where the bailor did not call upon the garage keeper for his tires for five or six months, that the gratuitous bailee, if he had desired to rid himself of the bailment at an earlier time, "could easily have notified respondent to this effect and thus terminated any possible liability for the loss of the tires."

> And so in the case before us, Etheredge, if he had desired to do so, could have terminated any liability which attached to him as a gratuitous bailee for Wilson's machinery, by duly advising Wilson that he would no longer be responsible for its preservation or protection. But this was not done, and having failed to do so, the law imposes upon his estate the duty and obligation to show the exercise of reasonable care under the attendant circumstances. *Marlow v. Conway Iron Works,* 130 S. C. 256, 125 S. E. 569; *Fleischman, Morris & Co. v. Southern Ry.,* 76 S. C. 237, 56 S. E. 974, 9 L. R. A., N. S., 519. The record

contains no evidence on the part of the respondents to explain the loss of the machinery or what degree of care, if any, was taken in its preservation. Consequently, the estate must be held responsible for its value.

The special referee disallowed the sum of $135.00, representing the value of a Rotary Shear, which was one of the articles of machinery listed as lost or unaccounted for. Wilson testified that he had authorized Etheredge to sell this piece of machinery, and that he had never been paid for it. This item was rejected by the referee upon the ground that it was a claim for money owed by Etheredge to Wilson, and constituted an account which would be barred by the statute of limitations. We think the evidence sustains this finding, and the exception raising this issue must be overruled.

There is one other item, $350.00, representing the value of a Blyth Press, which the special referee disallowed because the evidence showed that it was not in possession of the estate of L. K. Etheredge, but was in the possession of I. L. Culler. The referee held that Wilson had made no demand upon Culler for this Press, and that his inaction thereabout relieved the Etheredge Estate of responsibility. The record shows that when interviewed by Wilson, Culler told him that he had bought this Press from a man in North Carolina. Thereafter Wilson interviewed this person, who told him that he had no recollection of having sold the Press to Culler.

In our opinion, the referee was in error in disallowing this item of the claim. Wilson met the requirements of the law when he introduced evidence showing that the Press in question was placed by him in the care and possession of Etheredge; and the failure of the estate to return or account for it. This made out a *prima facie case*. The burden then rested upon the receivers to show the exercise of reasonable care, which they failed to do. They did not offer Culler as a witness to clarify the situation.

It follows that Wilson should have judgment against the estate of Etheredge in the sum of $611.87, the amount approved by the referee, to which should be added the sum of $350.00, the value of the Blyth Press, making a total of $961.87.

Judgment reversed.

BAKER, C. J., and STUKES, TAYLOR, and OXNER, JJ., concur.