**PILOT INDUSTRIES, Plaintiff,**

v.

**SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, Defendant.**

**Civ. A. No. 78–575.**

United States District Court,
D. South Carolina,
Columbia Division.

Nov. 8, 1979.

J. Wesley Drawdy, Columbia, S. C., for plaintiff.

Stephen G. Morrison, Nelson, Mullins, Grier & Scarborough, Columbia, S. C., for defendant.

## ORDER

CHAPMAN, District Judge.

This matter is before the Court on motion of the defendant for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The motion is made upon the ground that there is no genuine issue of any material fact, and that defendant is entitled to judgment as a matter of law.

The plaintiff is a South Carolina corporation, and the defendant is a New York corporation. Plaintiff, invoking this court's diversity jurisdiction, filed suit against Southern Bell alleging lost business opportunities and other losses as a result of interruptions in its telephone service and errors in its telephone directory listings.

Originally, plaintiff's complaint sounded in both contract and tort. On August 23, 1978, this Court granted defendant's motion to strike from the complaint all language sounding in tort. That Order stated in part, "it is obvious that the complaint in this action is grounded upon contract and that allegations as to negligence, carelessness, willfulness and wantonness are immaterial and unnecessary." At the October 30, 1979, hearing, however, the Court advised the parties that, after reading the memoranda and cases submitted in connection with the summary judgment motion, it determined that gross negligence, willfulness, or wantonness would support a verdict, converting what appeared to be a contract action into a tort action. For this reason, any allegations of gross negligence, willfulness, and wantonness contained in the original complaint are by this Order reinstated and the Order of August 23, 1978, is amended accordingly.

The following facts are not disputed. Plaintiff was engaged in the business of franchising automotive reconditioning facilities. Sales were generated as the result of national newspaper advertising. Potential customers, pursuant to these ads would communicate their interest in plaintiff's franchise by calling the company's toll–free number. This toll–free number, commonly called a WATS (Wide Area Telecommunications Service) line, was also offered by plaintiff as a service to its franchisees to help solve any business problems they might be experiencing.

Plaintiff's telephone problems began when it moved its business office from 3650 Bluff Road to 1955 Bluff Road in Columbia, South Carolina. Several weeks before the planned move, plaintiff's manager notified defendant's business office of the impending move. Plaintiff requested a change in telephone service, to be effective September 23, 1977, the date chosen for the move. Initially, plaintiff was informed that the business' phone numbers, both WATS and local lines, would remain the same; however, two days before the move, defendant informed plaintiff that the numbers would have to be changed because plaintiff's new location would be served out of a different central office. Plaintiff had relied on defendant's earlier representation that the numbers would not be changed, and had contracted for ads in a number of out–of–town newspapers urging potential customers to call their toll–free number. After some discussion, the defendant agreed that the WATS numbers could be preserved, and for several months defendant waived an additional charge for this service to allow plaintiff time to correct its advertising, stationery, and other business forms that had also been printed in contemplation of the move.

During the week prior to the move, defendant sent a representative to plaintiff's new location to take inventory of the equipment needed to complete the change in service. Plans were made for the installation to begin on September 22, the day preceding the move. On that day, the Southern Bell installer arrived at the new location and discovered that he did not have the proper equipment. The following day,

the day of the move, the installer returned and was still without the necessary equipment. Although phones were not serving the plaintiff's new location, telephone service was still operating at the old location, where plaintiff had instructed an employee to remain to answer all calls. The following day, Saturday, September 24, an installer returned with another employee to continue work on the installation of the phone system. Service was still operating at the old location. It was on this Saturday that plaintiff's officers decided to cancel certain newspaper advertisements that had been scheduled to run the following day. Installation activities resumed on Sunday, September 25, and continued until September 28. Telephone service at the old location was completely operative until September 27.

Plaintiff's new location is served by a total of five lines: two in–WATS, one out–WATS, and two local lines. The in–WATS and local lines are routed through a 24–hour answering service during non–business hours. On September 28, local service to the new location was working, but plaintiff's employees heard static on the lines. There were not, at this time or later, any problems with the local lines. The out–WATS line was fully operative on this date and caused no further problems. Plaintiff's problems were solely with the in–WATS lines.

On September 28, plaintiff received its first call on the in–WATS line at its new location. From September 28 until the first week in November, the in–WATS line functioned sporadically. The numerous problems that plaintiff was experiencing with the in–WATS line were reported to defendant, and defendant responded to these reports on October 12, 17, 18, and 31. Defendant's employees were unable to determine precisely what the difficulty was. From the time of installation in late September and early October, all lines except the in–WATS were working properly. On November 1, 1977, a faulty jack was reported at the answering service. Plaintiff admits that its phone problems ceased on November 2, after repairs were made to the answering service jack. Plaintiff claims it experienced trouble with the lines for a total of 41 days.

Plaintiff also claims business losses as a result of defendant's failure to list the name of plaintiff as "Professional Auto Clean Systems," ("PACS") in the white pages and in the yellow pages of the 1978 directory. The white and yellow pages deletions are related, and were apparently the result of a misunderstanding between the parties. The plaintiff, Pilot Industries, was properly listed in the 1978 directory. The directory dispute arises solely out of the failure of the defendant to list plaintiff as Professional Auto Clean Systems, in addition to Pilot Industries.

As early as 1976, plaintiff was conducting its business under the additional listing of Professional Auto Clean Systems at 1434 Ellerbe Street in Columbia. From November 3 until December 30, 1976, plaintiff also maintained a listing under the name Pilot Industries on Forest Drive. On December 30, 1976, plaintiff directed defendant to disconnect service to the Forest Drive location, and did not request referral of calls to the Ellerbe Street location. The result was that from December 30, 1976 until March 25, 1977, Pilot Industries ceased to exist on the records of Southern Bell. On March 25, 1977, plaintiff Pilot requested service at 3650 Bluff Road. At this time, plaintiff did not request an additional listing for Professional Auto Clean Systems; according to Southern Bell's records, this office was apparently still operating at the Ellerbe Street location.

On April 19, 1977, plaintiff requested that the Ellerbe Street service be disconnected, and requested that all calls to that location be referred to Pilot Industries at the Bluff Road location. No request was made to re–list plaintiff under the name Professional Auto Clean Systems. A recording referring all Ellerbe Street calls to the Bluff Road location was to continue until January 28, 1978, the effective date of the new 1978 directory. At no time after the Professional Auto Clean Systems number was discon-

nected in April, 1977, did plaintiff request a new 1977 listing for Professional Auto Clean Systems. The defendant had been instructed to refer all calls to PACS's disconnected number, which still appeared in the 1977 directory, to the Pilot Industries number on Bluff Road.

When defendant was preparing and planning the 1978 directory, it contacted Pilot about new advertising that it might want to appear in the new directory. It was during this time that the yellow pages dispute arose.

On October 3, 1977, defendant's sales representative visited plaintiff's office. He brought with him the "Directory Advertising Order" form that enumerated the listings for Professional Auto Clean Systems in the yellow pages of the 1977 directory. During the visit, the parties referred to this form to ascertain exactly what kind of advertising Professional Auto Clean Systems was currently running in the 1977 directory. In determining the advertising that PACS desired to run in the 1978 directory, certain current (1977) ads that appeared on the form were marked through and thus cancelled. The form indicates that the only advertising ordered was an ad that was to run at no charge because of a printer's error in the ad in the 1977 directory.

The mistake in the yellow pages for 1977 arose out of the following undisputed facts appearing on the record. Plaintiff was listed in the 1977 directory as Pilot Industries and as Professional Auto Clean Systems. Professional Auto Clean Systems was listed at the Ellerbe Street location. This listing appeared in the white pages and in the yellow pages. The yellow pages listings for PACS were included under two separate categories: "Automotive Upholstery–Cleaning" and "Car Washing and Polishing."

The yellow pages advertising was cancelled, according to the deposition of plaintiff's president, because the defendant failed to list PACS under "several different places, Upholstery Cleaning, Car Washing and Polishing." According to photocopies of the 1977 directory listings in question,

PACS did in fact appear under the headings enumerated by plaintiff's president in his deposition. There was no error in the categories under which plaintiff was listed. The error in question was a result of the printer's deletion of a cross reference ("See Our Ad Under Automobile Upholstery Cleaning") that should have been included with the plaintiff's ad appearing under the category "Car Washing & Polishing" in the 1977 yellow pages. During 1977, plaintiff had received a monthly credit in the amount of $1.25, the charge that would have been made for the cross reference had it been included. The form executed between the parties on October 3, 1977, indicates that plaintiff was to receive a free listing in the 1978 yellow pages under "Car Washing & Polishing" as a further remedy for the error. This free ad did not appear in the 1978 directory.

Similar complications also arose regarding the white pages listings. In the 1978 directory, the only listing appearing for PACS was an entity located at 2600 Two Notch Road in Columbia. This entity was a new franchisee of Pilot Industries, and was not the same entity that had appeared in the 1977 directory. The second PACS was also listed in the yellow pages under "Steam Cleaning–Automatic." The listing for the old entity, the PACS listed on Ellerbe Street, had been discontinued on April 19, 1977. The new listing for the second PACS did not appear in the 1977 directory, but did appear in the 1978 directory. As explained earlier, defendant had not been informed that Pilot Industries desired to continue the PACS listing when the listing was cancelled in April; Pilot simply requested that calls to the Ellerbe Street location be referred to its office on Bluff Road. The listing for the second PACS entity (the franchisee) had been accepted after the April cancellation of the listing of the first PACS (Pilot operating under the name of Professional Auto Cleaning Systems.)

On January 17, 1978, the plaintiff notified defendant that its PACS, the first PACS, was not listed in the new directory. Defendant is prohibited from listing two

firms by the same name in the white pages without the permission of both. In an attempt to resolve the dilemma, defendant instituted a "split intercept and reference" on the number that was listed as belonging to the second PACS. The result of the split intercept was that any call to the number listed for the second PACS on Two Notch Road were interrupted by an operator who asked which business, the Two Notch Road location or the Bluff Road location, the caller wanted to reach. When this information was given, the intercept operator would give the caller the appropriate number.

All of the facts as detailed above are undisputed, and appear in the court's record of this case. The defendant contends that even if these facts are taken to be true, that no issue exists for trial. The defendant's major contention is that its liability is limited by tariffs filed with the South Carolina Public Service Commission and the Federal Communications Commission. The intrastate communications that were disrupted are controlled by the tariffs on file with this state's agency. The corresponding interstate communications are controlled by the tariffs filed with the federal commission. Of particular significance is a tariff that is filed in identical form with both agencies. This is Tariff A.2.5.1, approved by the South Carolina Public Service Commission, and Federal Communications Commission Tariff No. 259 § 2.1.3(B). Both of these tariffs state:

> The liability of the company for damages arising out of the mistakes, omissions, interruption, delays, errors, or defects in transmission, or failure or defects in facilities furnished by the company occurring in the course of furnishing service for facilities and not caused by the negligence of the subscriber, or of the company in failing to maintain proper standards of maintenance and operations and to exercise reasonable supervision shall in no event exceed an amount equivalent to the proportional charge to the subscriber for the period of service during which such mistake, omission, interruption, delay, error or defect in transmission or defect or failure in facilities occurs.

Under the terms of the tariff, the defendant's liability for service interruption is limited unless the claimant can show that it failed to "maintain proper standards of maintenance and operation" or that the company failed to "exercise reasonable supervision." No where in the record of this case does plaintiff assert a failure of defendant to exercise reasonable supervision. This Court agrees with defendant that "proper standards of maintenance and operation" means the rules, regulations and standards filed with the South Carolina Public Service Commission and the Federal Communications Commission. In any event, it is unnecessary to decide this issue because plaintiff has not contended nor produced any evidence that alleges the losses claimed were the result of defendant's failure to maintain proper standards.

Plaintiff's major contention is that material, genuine issues of fact exist. Plaintiff, however, has filed no affidavits that point out specific disputed facts. Rule 56(e) provides that a party may not rely upon the allegations of his complaint to create an issue of fact. Plaintiff also alleges that one of the tariffs bears an effective date of May 16, 1979. Although some of the tariffs cited in defendant's memorandum may bear this date, the tariff considered in this Order was on file with both agencies at the time the alleged breach of contract or gross negligence occurred.

Finally, in its memorandum opposing the motion plaintiff alleges that a decision on this issue is improper at the summary judgment stage of the proceeding. Plaintiff states that none of the cases relied upon by the defendant were decided at this point, and that all cases argued in support of the motion were decided at the trial level of the proceeding. Plaintiff is in error. *See, e. g., Holman v. Southwestern Bell Telephone Co.,* 358 F.Supp. 727 (D.Kan.1973), *Olson v. Mountain States Telephone & Telegraph,* 119 Ariz. 321, 580 P.2d 782 (1978), *Waters v. Pacific Telephone Co.,* 12 Cal.3d 1, 114 Cal. Rptr. 753, 523 P.2d 1161 (1974); *But see*

*Horwitz v. Chesapeake & Potomac Telephone Co.*, 265 A.2d 772 (D.C.1970) (summary judgment held improper under language of different tariff limitation).

The South Carolina Supreme Court has held that rules, regulations and tariffs have the force and effect of law, and that subscribers and regulated industries are bound thereby whether or not they have expressly agreed thereto. *Clarke v. General Telephone Company of the Southeast*, 268 S.C. 92, 232 S.E.2d 26 (1977). The particular tariff involved in this action has never been the subject of judicial scrutiny in this state. In other jurisdictions, however, the validity of similar tariffs have been the issue of litigation. *See generally*, Annot., 67 A.L. R.3d 76, 124–30 (1975 & 1979 Cum.Supp.).

An identical tariff provision was construed in *Southern Bell Telephone & Telegraph Co. v. Invencheck, Inc.*, 130 Ga.App. 798, 204 S.E.2d 457 (1974). In answering the plaintiff's contention that this limitation exceeded the powers of Georgia's public service commission, the state's court said:

> [I]t is to the public interest to have uninterrupted service at a reasonable price, it necessarily follows that a reasonable limitation of liability for damages for interrupted telephone service may be considered as a part of the telephone rate-making function.

130 Ga.App. at 800, 204 S.E.2d at 460.

The courts have long recognized the relationship between the limiting of liability of telephone companies as it relates to the public interest served by lower utility rates. As Justice Brandeis stated in a similar context, "The limitation of liability [is] an inherent part of the rate." *Western Union Telegraph Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 571, 41 S.Ct. 584, 586, 65 L.Ed. 444 (1921).

That a public utility, through government regulation, may properly limit its liability for certain acts or omissions, was cogently expressed by a California court:

> There is nothing harsh or inequitable in upholding such a limitation of liability when it is thus considered that the rates as fixed by the Commission are established with the rule of limitation in mind. Reasonable rates are in part dependent upon such a rule.

*Cole v. Pacific Telephone & Telegraph Co.*, 112 Cal.App.2d 416, 246 P.2d 686 (1952), *quoted in Ivencheck, supra*, 130 Ga.App. at 800, 204 S.E.2d at 460.

The plaintiff can not and does not, dispute the validity of the tariff limitation as set out above. Numerous courts have recognized the validity of similar tariffs, and this Court finds further quotation from these opinions unnecessary. *See e. g., Olson v. Mountain States Telephone & Telegraph Co.*, 119 Ariz. 321, 580 P.2d 782 (1978) (involving almost identical tariff limitation); *Waters v. Pacific Telephone Co.*, 12 Cal.3d 1, 114 Cal.Rptr. 753, 523 P.2d 1161 (1974); *Wilkinson v. New England Telephone and Telegraph Co.*, 327 Mass. 132, 97 N.E.2d 413 (1951); *Abraham v. New York Telephone Co.*, 85 Misc.2d 677, 380 N.Y.S.2d 969 (1976); *Southwestern Bell Telephone Co. v. Rucker*, 537 S.W.2d 326 (Tex.Civ.App.1976) (involving almost identical tariff limitation).

For over fifty years, the legislature of this state has vested the Public Service Commission with broad supervisory and regulatory powers of public utilities.

> The Public Service Commission is hereby vested with power and jurisdiction to supervise and regulate the rates and service of every public utility in this State and to fix just and reasonable standards, classifications, regulations, practices and measurements of service to be furnished, imposed or observed and followed by every public utility in this State.

S.C.Code Ann. § 58–3–140 (1976).

This Court is of the opinion that the tariff adopted by the South Carolina Public Service Commission and the Federal Communications Commission is reasonable and controlling. A number of other jurisdictions have recognized the same limitations in tariffs. The limitation exists as an integral part of the rate–making function, a function that is totally regulated by state and federal agencies. The tariff has been

recognized as a reasonable limitation of liability by the agencies exclusively empowered by the state and federal governments to make this determination.

The United States District Court for the District of Kansas recently had occasion to consider defendant's motion for summary judgment in a case involving similar facts, *Holman v. Southwestern Bell Telephone Co.*, 358 F.Supp. 727 (D.Kan.1973). In that case, the plaintiff corporation sued the defendant phone company for breach of contract, or, in the alternative, negligence. The complaint alleged that the defendant had provided inadequate intrastate phone service in Kansas and Missouri, and that the plaintiffs had suffered considerable business loss as a result. A tariff similar to the one at issue here was on file with the state regulatory agencies in both states. In holding that the tariffs were effective to limit the defendant's liability, and granting the motion for summary judgment, the *Holman* court said:

> [I]nsofar as plaintiffs are attempting to state a claim for an alleged breach of an express or implied contract to provide adequate telephone service, the tariff's limitation of liability is reasonable and controlling.

358 F.Supp. at 730.

This Court is likewise convinced that the tariff on file with the South Carolina Public Service Commission and the Federal Communications Commission effectively limits defendant's liability for service interruptions in the absence of its gross negligence or wilful/wanton conduct.

Therefore, the next determination to be made is whether there is any evidence on the record that would show that defendant was grossly negligent or acted in a willful or wanton manner. The evidence, and any inferences to be drawn therefrom, taken in the light most favorable to the plaintiff, do not rise to the point of gross negligence, willfulness, nor wantonness on defendant's part.

South Carolina courts have recognized "gross negligence" only when the defendant has failed to exercise a slight degree of care. *Wilson v. Etheredge*, 214 S.C. 396, 52 S.E.2d 812 (1949). Gross negligence is "the intentional, conscious failure to do a thing that is encumbent [*sic*] upon one to do, or the doing of a thing intentionally that one ought not to do." *Ford v. Atl. Coastline R.R.*, 169 S.C. 41, 168 S.E. 143 (1932). Gross negligence has been defined as "the failure to exercise slight care." *Anderson v. Ballenger*, 166 S.C. 44, 55, 164 S.E. 313, 317 (1932).

The test under which an act can be characterized as reckless, willful or wanton was articulated by the South Carolina Supreme Court in *Rogers v. Florence Printing Co.*, 233 S.C. 567, 106 S.E.2d 258 (1958). The Court in that case stated that this determination is made by ascertaining whether the act complained of

> has been committed in such a manner or under such circumstances that a person of ordinary reason or prudence would then have been conscious of it as an invasion of the plaintiff's rights. . . . It is this *present consciousness of wrongdoing* that justifies the assessment of punitive damages . . .; and it has been variously referred to as 'conscious failure to observe due care;' . . . 'conscious indifference to the rights of others,' . . . and as 'gross disregard of the rights of the person injured.' . . . But the common denominator of these expressions is the test before mentioned, *viz.*: that at the time of his act or omission to act the tort–feasor be conscious, or chargeable with consciousness, of his wrongdoing.

233 S.C. at 577–78, 106 S.E.2d at 263–64 (citations omitted) (emphasis added)

Proof of error or mistake alone has been held to be insufficient to make out a case of gross negligence. *Halsted v. Postal Telephone Co.*, 193 N.Y. 293, 85 N.E. 1078 (1908). In a recent case involving interruptions in telephone service, another New York court held that proof that phones were ordered in December and were not fully functional until February, and that, during this period plaintiff complained con-

stantly to the company, was not sufficient to constitute gross negligence. *Eisner v. N.Y. Telephone Co.*, 67 Misc.2d 506, 324 N.Y.S.2d 196 (1970). The Court in that case said:

> I do not doubt that plaintiff made the many complaining calls to which he testified, but I believe they reflected his exasperation first at the slow pace of installation, and thereafter at the slow pace of repair. The Court can sympathize with plaintiff—more and more of his fellow citizens are finding that, faced with an explosion in numbers and technology, defendant is unable to provide its crucial services with the apparent effortless efficiency of bygone days. Perhaps, having a virtual monopoly, defendant is not doing everything it could to remedy its problems.
>
> In any event, there is nothing in the record to sustain a finding of 'gross negligence' or 'wilful misconduct' on the part of the defendant which is required . . before defendant can be held liable for damages for service interruption. These rules and regulations and the limitations on liability therein have been upheld by the courts . . .
>
> Accordingly, plaintiff is entitled herein only to a pro–rata service credit . . ..

67 Misc.2d at 507, 324 N.Y.S.2d at 197.

In *Holman v. Southwestern Bell Telephone Co., supra,* a Kansas federal court had occasion to consider defendant phone company's motion for summary judgment in a case involving similar facts. That Court held, as this Court has, that the tariff filed with the states' utility commissions limited the defendant's liability unless plaintiff could show that the service interruptions were attributable to willful or wanton conduct on the part of the telephone company. The Court held, as a matter of law, that the following acts or omissions did not constitute willful or wanton conduct:

> A. The plaintiffs' telephone number did not ring when persons dialed the plaintiffs' telephone number.

> B. Persons dialing the plaintiffs' telephone number received a busy signal when in fact none of the plaintiffs' telephones were in use.

> C. Persons calling the plaintiffs' telephone could hear the answering party faintly, however, the parties were not able to communicate.

> D. The plaintiffs' equipment did not work in conjunction with the main body of telephone equipment and did not function as normal telephone equipment functions.

> E. Other telephone calls were superimposed upon those of the plaintiffs.

> F. A mechanical intercept would erroneously advise persons calling plaintiffs' telephone numbers that the numbers were no longer in service.

> G. Defendant failed to properly maintain the equipment connecting plaintiffs' telephones with the central offices out of which plaintiffs' telephones were maintained, and defendant failed to maintain properly the telephone equipment installed by the defendant upon plaintiffs' premises. . . .

> H. Defendant failed to furnish a sufficient number of sufficiently–trained personnel to repair the equipment when it malfunctioned, both at plaintiffs' premises and in the central offices noted.

358 F.Supp. at 730.

After considering these complaints, the Court said:

> The general rule is that the tariff limitations apply, but an exception is made where defendant's conduct has been willful and wanton. Even taking all of the plaintiff's allegations of negligence as true, we hold that, as a matter of law, the plaintiffs have failed to show willful or wanton conduct, as defined by the courts. . . . Hence, plaintiffs are precluded by the tariff from asserting their claim for negligence.

*Id.*

A similar situation was presented in *Wilkinson v. New England Telephone & Telegraph Co., supra.* In that case, the plaintiff lodged nineteen complaints with the phone

company, complaining of faulty service that continued over a period of almost five months. She complained that her customers received a busy signal when calling her phone when, in fact, the phone was not in use. At other times, the bell did not ring when calls were placed to her number. The Court in *Wilkinson* granted summary judgment on the basis of a tariff limiting liability for these failures in service. The Court stated:

> Nowhere . . . is there a sufficient allegation of facts from which the jury could infer or find any willful or wanton misconduct on the part of the defendant.

327 Mass. at 135, 97 N.E.2d at 415.

In *Southwestern Bell Telephone Co. v. Rucker, supra,* a similar case, the Texas Court noted:

> While the record is replete with instances when the station could not broadcast because of problems with Telephone Company lines, or interference with lines between the station and transmitter, we find no evidence that the error in reconnecting the remote control lines at the transmitter resulted from an entire want of care which would raise the belief that the acts or omissions were the result of conscious indifference to the rights or welfare of the persons to be affected by them. This has long been the requirement in the gross negligence cases.

537 S.W.2d at 332–33 (citations omitted)

In *Olson v. Mountain States Telephone & Telegraph Co.,* 119 Ariz. 321, 580 P.2d 782 (1978), a phone customer sued the company for damages for losses of potential customers and revenues. The plaintiff claimed that these losses were a direct result of defendant's failure to place an intercept on the plaintiff's old telephone line after she had moved her business. The company conceded that no intercept was installed until several months after her initial complaint was made. It was possible, but difficult, for people to reach plaintiff after her move. There were many callers who never reached her. In granting the defendant's motion for summary judgment, the Court said:

Appellant presented no evidence that appellee failed to place the intercept on her old telephone number intentionally or that they had done it deliberately. . .

Appellant nonetheless argues that there is still a genuine dispute of fact as to whether the acts of the telephone company were done intentionally and that summary judgment was therefore improper. She argues . . . that where it is shown that a defendant has committed several negligent acts an inference can be drawn therefrom that the defendant acted intentionally . . . . Wanton negligence is established if: 'a defendant intentionally does or fails to do an act, knowing or having reason to know of facts which would leave a reasonable man to realize that his conduct not only created an unreasonable risk of harm to another, but involved a high degree of probability that such harm would result. . .'

A plaintiff cannot establish intentional and deliberate conduct within the tariffs exception to the limitation on liability merely by showing a series of negligent acts.

119 Ariz. at 323, 580 P.2d at 784 (citations omitted).

This Court agrees with defendant's position that there has been no showing of gross negligence, wilfullness or wantonness on the part of Southern Bell. This Court has considered all of the evidence in the light most favorable to the plaintiff in this action, and has operated on the assumption that all of plaintiff's allegations are true: that they did encounter the claimed installation problems; that they did experience sporadic in–WATS service from September 22 to November 2, 1977; that they did voice numerous complaints to defendant; and that PACS's listing was deleted from the 1978 directory. Even viewing the evidence in this light, however, there is still no showing of a present consciousness of wrongdoing on the defendant's part. In the absence of this showing, the tariff limitations must apply and operate to limit defendant's liability in this case.

■ Furthermore, this Court is convinced that plaintiff cannot, as a matter of law, recover on the claim that PACS's listing was omitted in the white pages for the 1978 directory.

In South Carolina, the white pages portion of the directory is mandated by a regulation of the South Carolina Public Service Commission:

> Telephone directories shall be published at regular intervals listing the name, address, and telephone numbers of all customers . . . . .

S.C.Pub.Service Commission Reg. 103–631, S.C.Code Ann. R 103–631 (1976).

In this case, the defendant has met its primary obligation by publishing the name and address of its customer, Pilot Industries, in the white pages of the 1978 directory. Tariff A6.2, on file with the South Carolina Public Service Commission, supports this conclusion. This tariff indicates that the primary listing of a corporation is ordinarily the name of the corporation that contracts for the service or its bona fide business name. Pilot Industries was listed in the 1978 white pages. Therefore, defendant fulfilled all duties owed to the plaintiff under the tariffs, rules and regulations.

In late 1977, the plaintiff cancelled its contract for a yellow pages advertisement to be run in the 1978 directory. Plaintiff had, in April, 1977, discontinued all telephone service to PACS and directed all calls to be referred to Pilot Industries on Bluff Road. After this cancellation, the franchise PACS requested a listing at their Two Notch Road location. It was not unreasonable for defendant to treat these two PACS entities as one and the same.

Southern Bell satisfied its duty to plaintiff when it promptly installed the split intercept after being notified of plaintiff's complaint. Regulation 103–631, of the South Carolina Public Service Commission, provides, in part:

> In the event of an error in the listed numbers of any customer, the telephone utility shall intercept all calls to the listed number for a reasonable period of time

providing existing central office equipment will permit and the number is not in service. In such event or an error or omission in the name listing of a customer such customer's correct name and telephone number shall be in the files of the directory assistance operators. The correct number furnished upon the calling party either upon request or interception.

S.C.Pub.Service Commission Reg. 103–631(G), S.C.Code Ann. R 103–631 (G) (1976).

Southern Bell met its obligations under this regulation. It not only listed plaintiff's PACS number with directory assistance, but it also provided an intercept on the line of the PACS franchisee which enabled callers to select which PACS they wished to reach. Defendant fulfilled all duties to the plaintiff, and is entitled to judgment as a matter of law for its failure to list plaintiff's PACS in the white pages of the 1978 directory.

■ Defendant is also entitled to judgment on the omission of PACS's advertisement from the 1978 yellow pages. Pursuant to a clause in the contract for advertising, defendant, as a matter of law, successfully limited its liability for errors or omissions in yellow pages ads. In the "Directory Advertising Order" form executed by the parties on October 3, 1977, reference is made on the front of the form to the following limitation appearing on the back of the form:

> THE TELEPHONE COMPANY'S LIABILITY ON ACCOUNT OF ERRORS IN OR OMMISSIONS [*sic*] OF SUCH ADVERTISING SHALL IN NO EVENT EXCEED THE AMOUNT OF CHARGES FOR THE ADVERTISING WHICH WAS OMITTED OR IN WHICH THE ERROR OCCURRED IN THE THEN CURRENT DIRECTORY ISSUE AND SUCH LIABILITY SHALL BE DISCHARGED BY AN ABATEMENT OF THE CHARGES FOR THE PARTICULAR LISTING OR ADVERTISEMENT IN WHICH THE OMISSION OR ERROR OCCURRED.

This language alone is sufficient to relieve defendant of liability. A South Carolina Supreme Court opinion directly addresses this issue. In *Pride v. Southern Bell Telephone & Telegraph Co.*, 244 S.C. 615, 138 S.E.2d 155 (1964), a dentist sued the phone company to recover damages allegedly resulting from the incorrect listing of his address and telephone number in his yellow pages advertisement. The ad was published pursuant to a written contract between the parties in which the liability of the defendant for errors was limited to an amount not to exceed the charges for the advertisement. The sole issue before the Court was the validity of the contractual limitation of liability for negligence in the publication of an erroneous ad. In ruling for the defendant, the Court stated:

> In our opinion, the publication of plaintiff's ad was wholly a matter of private contract. Such contracts are not required to be filed with the South Carolina Public Service Commission and the Commission exercises no jurisdiction over this feature of defendant's telephone directory. The defendant was not required to render an advertising service as a part of its duties as a public utility. If the plaintiff had not purchased the ad, he would have been deprived of no service which the defendant was obligated or assumed to render as a public service. Therefore, the publication of the ad . . . was within an area of activity in which the defendant could freely contract in its private capacity.

244 S.C. at 620–21, 138 S.E.2d at 157.

This Court finds that the *Pride* case controls the issue of liability for the omission of plaintiff's ad in the yellow pages. Defendant is entitled to summary judgment on this issue.

Because it finds no evidence of gross negligence or of willful or wanton conduct on the defendant's part, this Court finds, as a matter of law, that the tariff limitations apply to limit plaintiff's claim for damages for the interruptions in service. Similarly, this Court finds that defendant is entitled to summary judgment on the claim of omissions in the white and yellow pages of the 1978 telephone directory. There is no genuine issue for trial because the plaintiff is limited by the tariff to recovery of damages in the pro rata amount for the period during which it experienced service interruptions. Plaintiff is likewise limited to recovery of the consideration, if any, paid for the white and yellow pages listings. It is unnecessary for this Court to address the defendant's claim that the damages are speculative and incapable of proof. No genuine issue of material fact remains. For the foregoing reasons, this Court grants defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Southern Bell is entitled to judgment as a matter of law that the tariffs of the South Carolina Public Service Commission and the Federal Communications Commission limit defendant's liability to plaintiff for the service delays and interruptions claimed in this case to pro rata allowance to be calculated in accordance with said tariffs. Southern Bell is further entitled to judgment as a matter of law that the plaintiff is precluded from recovery for any white pages errors by virtue of defendant's uncontradicted compliance with the Rules and Regulations of the South Carolina Public Service Commission. Southern Bell is entitled to judgment as a matter of law that its liability is limited, by the express terms of the yellow pages contract with plaintiff, to a refund of the cost of the advertising if same has been paid by plaintiff. If the parties cannot agree on the amounts due hereunder within 15 days the Court will hear testimony on this issue.

AND IT IS SO ORDERED.