557 S.E.2d 676

**Sue BROWN, as Personal Representative of the Estate of James E. Brown, III, Respondent,**

**v.**

**John M. STEWART and J. David Gibson, Appellants.**

**No. 3408.**

Court of Appeals of South Carolina.

Heard Sept. 6, 2001.
Decided Nov. 19, 2001.
Rehearing Denied Jan. 16, 2002.

34

38

Harry A. Swagart, III, and Robert L. Reibold, both of Swagart, Walker & Reibold, of Columbia, for appellants.

Michael H. Montgomery and Douglas L. Novak, both of Montgomery, Patterson, Potts & Willard, of Columbia, for respondent.

CURETON, Judge:

James E. Brown, III brought this action against John M. Stewart and J. David Gibson (collectively, Appellants) alleging they made misrepresentations in securing his investment in Mid–Atlantic Administrators, Inc. and managed the corporation for their own benefit. Brown also sought an injunction to

prevent the proposed sale of Mid–Atlantic's assets. Appellants appeal from a jury verdict in favor of Brown. We affirm in part and reverse in part.

## FACTS

Mid–Atlantic was a South Carolina corporation formed in 1995 by Frank Altier (President), J. David Gibson (Vice President), John M. Stewart (Secretary/Treasurer), and John Silvers, with each holding a 25% ownership interest. The corporation operated as a third-party health insurance administrator (TPA).

In April 1996, Brown purchased a 20% interest in Mid–Atlantic, a total of seventy-five shares, for $100,000. Altier, Gibson, Stewart, and Silvers each retained a 20% interest in the corporation.

In a Letter of Intent dated December 5, 1997, Carolina Benefit Administrators, Inc. (CBA) offered to purchase the assets of Mid–Atlantic for $1,000,000, of which $300,000 was to be paid as consulting fees to Gibson, Silvers and Stewart, "the three principal producers." In a subsequent Letter of Intent dated January 12, 1998, CBA offered to purchase the assets of Mid–Atlantic for $725,000 including the consulting fees of $300,000 to be paid to Gibson, Silvers, and Stewart. The proposed sale was scheduled to take place on January 22, 1998.

After reviewing the terms of the proposed sale, Brown concluded Appellants had used his money to cash out their own investments and they were receiving excessive consulting fees. Brown instituted this lawsuit in January 1998 to recover the full value of his shares plus a return on his investment, alleging numerous misrepresentations had been made to him regarding Mid–Atlantic. He further alleged he relied on the representations in deciding to make his investment. Brown asserted claims for, among other things, fraud, negligent misrepresentation, and breach of fiduciary duty. He also sought a temporary restraining order (TRO) to prevent the proposed sale of Mid–Atlantic's assets. Appellants answered

and counterclaimed for tortious interference with prospective contractual relations and sought actual damages of at least $555,000, as well as punitive damages.

On January 20, 1998, the trial court granted Brown's request for a TRO until a hearing could be held. The order provided, among other things, that Appellants were enjoined from individually collecting any funds for the sale of Mid–Atlantic but that *"the corporation* may collect the sales proceeds and deposit them in its account *to be later distributed* in accordance with orders of this court[.]" [Emphasis added.] On February 13, 1998, the court, with the consent of Appellants' counsel, continued the provisions of the TRO until further order.

At trial in October 1999, the court granted Brown's motion for a directed verdict on Appellants' counterclaim. The jury returned a verdict for Brown jointly and severally against Appellants for $50,000 actual damages on each of the three remaining causes of action for fraud, negligent misrepresentation, and breach of fiduciary duty.[1]

Appellants filed motions for (1) a JNOV or new trial, and (2) election of remedies. The trial judge denied the motion for a JNOV or new trial. By separate order, the court granted Appellants' motion for an election of remedies, ruling Brown "is entitled to recovery on the breach of fiduciary duty verdict and either the fraud or the negligent misrepresentation verdict." The court stated Brown "must elect between remedies on the fraud and negligent misrepresentation awards, choosing to recover $50,000 in damages on only one of those verdicts." The court noted Brown's "recovery of damages on the breach of fiduciary duty verdict is unaffected by his election of remedies regarding the other verdicts." This appeal followed.[2]

---

**1.** Silvers and Altier were originally named as defendants but were dismissed prior to trial. Mid–Atlantic was dismissed as a defendant at trial.

**2.** Brown passed away during the pendency of this appeal and his wife, as personal representative of his estate, has been substituted for him as a party for this appeal.

## LAW/ANALYSIS[3]

### I. Fraud and Negligent Misrepresentation

Appellants first contend the trial court erred in denying their motions for a directed verdict, JNOV, or new trial on Brown's claims for fraud and negligent misrepresentation. We disagree.

The trial court, in ruling on motions for directed verdict and JNOV, is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions and deny the motions where either the evidence yields more than one inference or its inference is in doubt. *Strange v. S.C. Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 429–30, 445 S.E.2d 439, 440 (1994). "The trial court can only be reversed by this Court when there is no evidence to support the ruling below." *Id.* at 430, 445 S.E.2d at 440.

"A motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict." *Gastineau v. Murphy*, 331 S.C. 565, 568, 503 S.E.2d 712, 713 (1998). If more than one inference can be drawn from the evidence, the grant of a JNOV is improper and the case must be left to the jury's determination. *Id.* "The verdict will be upheld if there is any evidence to sustain the factual findings implicit in the jury's verdict." *Shupe v. Settle*, 315 S.C. 510, 515, 445 S.E.2d 651, 654 (Ct.App.1994).

A party asserting a claim for fraud in the inducement to enter into a contract must establish "(1) a representation, (2) its falsity, (3) its materiality, (4) knowledge of its falsity or reckless disregard of its truth or falsity, (5) intent that the representation be acted upon, (6) the hearer's ignorance of its falsity, (7) the hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury." *Parker v. Shecut*, 340 S.C. 460, 482, 531 S.E.2d 546, 558 (Ct.App.2000). As noted in *Parker*:

The failure to prove any one of these elements is fatal to the claim. Generally, the representation must relate to a pres-

---

**3.** Appellants allege over sixty errors on appeal. We have consolidated the allegations where possible.

ent or pre-existing fact rather than a statement of future events or an unfulfilled promise. An exception to the general rule is recognized for unfulfilled promises which were made by a party who never intended to fulfill the promise and only made it to induce the performance of another party.

*Id.* (citations omitted). "Fraud is not presumed, but must be shown by clear, cogent, and convincing evidence." *Ardis v. Cox,* 314 S.C. 512, 515, 431 S.E.2d 267, 269 (Ct.App.1993).

A plaintiff in a negligent misrepresentation action, must prove (1) the defendant made a false representation to the plaintiff, (2) the defendant had a pecuniary interest in making the statement, (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff, (4) the defendant breached that duty by failing to exercise due care, (5) the plaintiff justifiably relied on the representation, and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation. *Hurst v. Sandy,* 329 S.C. 471, 481, 494 S.E.2d 847, 852 (Ct.App.1997).

Thus, a key difference between fraud and negligent misrepresentation is that fraud requires the conveyance of a known falsity, while negligent misrepresentation is predicated upon transmission of a negligently made false statement. *Gruber v. Santee Frozen Foods, Inc.,* 309 S.C. 13, 20, 419 S.E.2d 795, 799 (Ct.App.1992) ("Recovery in negligent misrepresentation cases is based upon negligent conduct and predicated upon a negligently made false statement where a party suffers either injury or loss as a consequence of relying upon the misrepresentation. It is not a fraud and deceit action; it is a negligence action . . . .") (citation omitted).

To support his claims for fraud and negligent misrepresentation, Brown alleges the following misrepresentations were made to him to induce him to invest $100,000 in Mid–Atlantic. First, Appellants told him that they (Gibson and Stewart) along with Silvers had each "invested" approximately $25,000 in the company and were given equal shares (25%) of the stock, and that Altier was given an equal amount of stock (25%) as "sweat equity" based on his expertise in running TPAs. However, Brown later discovered that Appellants had

characterized their funds as "loans" instead of stock equity, and they had used his investment to repay the loans to themselves with interest of nearly 16%. Second, Appellants falsely represented to him that his investment would be used for computers, computer software, marketing, and additional personnel. However, as noted above, Brown's invested capital went instead to pay back the "loans" from Appellants. Third, appellant Gibson gave Brown a letter dated February 20, 1996 from Altier, Mid–Atlantic's president, which made specific representations about the number of employee lives and groups that were currently covered by Mid–Atlantic and its plans for acquiring certain other groups. The letter also stated that Mid–Atlantic was "in the final stages of linking our computers and expect[ed] to be operational by April 1, 1996."

As additional examples of Appellants' misrepresentations, Brown testified that when he asked Gibson for additional financial information after receiving the Altier letter, Gibson took Brown down the hall to see Stewart, who gave him a balance sheet. According to Brown, Stewart told him Mid–Atlantic was having cash flow problems, Appellants had invested as much as they could, and Appellants needed additional capital to finance their growth. Brown testified that he never would have invested $100,000 in the corporation if he had known Appellants had no equity interest or investment in the corporation. Brown stated he was never told Appellants had only made loans to the corporation and would be using his investment to repay themselves instead of purchasing computers and hiring additional staff as was represented to him.

Brown asserted Appellants also told him "they were [going to] be in Mid–Atlantic for the long haul ... and pay out some dividends to ... shareholders eventually." Brown testified that despite this representation, he never received dividends from the corporation; rather, the corporation did not show a profit and "[e]verything [he] could determine [that] should be profits were going into David Gibson, John Stewart's and John Silvers' pockets." Moreover, Brown alleged Appellants abused their positions as officers and directors of the corporation to orchestrate the sale of Mid–Atlantic's assets in a way that was unduly favorable to themselves.

44

Appellants argue they were entitled to a directed verdict, JNOV, or new trial on both the fraud and negligent misrepresentation claims. Appellants contend there was no misrepresentation in any of their statements. They particularly assert that their statement alleging they had each "invested" $25,000 in Mid–Atlantic was not misleading as "invested" can also mean "loaned." They further argue there was no evidence Brown ever relied on any of the alleged misrepresentations.

We find the evidence presented by Brown created a question of fact for the jury as to whether any of the alleged statements could be deemed misleading. We note that, as to the meaning of "invested," the evidence showed Brown was told all of the other shareholders, except Silvers, had "invested" approximately $25,000 in return for their stock, so a reasonable inference is they maintained an equity interest in the corporation. As to the February 1996 letter, Altier testified that at the time he wrote the letter, he was attempting to describe the business and "the fact that we were acquiring enough business at such a fast pace that there was a need for additional capitalization of the company so that we could basically lease more space, we could hire some more personnel and all of the things that we needed including computers and so forth." Further, Brown testified repeatedly as to his reliance, asserting he never would have invested in Mid–Atlantic had he known Appellants had virtually no capital investment in the corporation and that they were going to use his investment to repay themselves instead of purchasing computers, computer software, marketing, and additional personnel as had been represented to him at the time of his investment.

Appellants further argue Brown had no right to rely upon the alleged misrepresentations and failed to exercise due diligence. They contend the balance sheet given to Brown showed loans made to the corporation, and that they did not have a confidential relationship with Brown to justify his reliance. Appellants also argue "Brown's cause of action for negligent misrepresentation is barred because his losses were caused by his own negligence." They assert, "[t]he failure to exercise due diligence is as much a defense to negligent misrepresentation as it is to fraud."

We find there is a jury question presented as to the legitimacy of Brown's right of reliance in this case. Although Appellants apparently presented one balance sheet to Brown which indicated some loans had been made to the corporation, they simultaneously told him that they had each invested $25,000 in the corporation and were seeking additional capital to finance their expansion. In addition, when Altier was asked whether the money was a loan or capital investment, he testified as follows: "It was my understanding at the time that the money basically would be capital into the company that would set up to get the company going and it would be basically set up through stock issuance on an equal basis." Altier asserted, "It was not my understanding it was a loan[.]" Altier conceded that he did not believe Appellants or any of the other shareholders would be entitled to take out any of the money contributed unless the corporation succeeded and made a profit.

Brown testified that he believed he had a right to rely on Appellants as they controlled all of the information about Mid–Atlantic and he could not obtain it from any other source. He stated Appellants "were upstanding citizens in the community and had been in the insurance business for a number of years." Brown testified he had known Gibson casually "for a number of years." We find that Brown's right to rely was a matter to be resolved by the jury after considering the conflicting evidence in this regard. *See ML–Lee Acquisition Fund, L.P. v. Deloitte & Touche,* 327 S.C. 238, 240–41 nn. 2 & 3, 489 S.E.2d 470, 471 nn. 2 & 3 (1997) (adopting section 552 of the Restatement (2d) of Torts (1977), which provides: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transaction, is subject to liability. . . .").

Appellants also contend there is insufficient evidence of damages to support Brown's claims. Brown testified that he lost his initial investment of $100,000 plus the amount of interest or gain he would have earned on this money had the corporation operated properly. Brown stated if his money had been placed in a savings account at 5% annually instead of Mid–Atlantic it would have been worth $120,000. Moreover, he testified that if Appellants had sold the assets and properly

distributed the proceeds, he would have received approximately $140,000.[4] Reviewing all of the evidence in the light most favorable to Brown, as we are required to do, we find there is evidence to support the trial court's decision to deny Appellants' motions. There was more than one reasonable inference arising from the evidence as to whether Appellants either knowingly or negligently made false representations to Brown to induce his investment in Mid–Atlantic. Further, the evaluation of the testimony and the credibility of the witnesses were matters for the jury to determine. *See Doe v. Asbury,* 281 S.C. 191, 194, 314 S.E.2d 849, 850 (Ct.App.1984) ("Judging the credibility of the testimony of witnesses is a function of the jury, not the court, as is the weight to be given to such testimony.").

## II. Breach of Fiduciary Duty

Appellants argue the trial court erred in denying their motions for directed verdict, JNOV, or new trial on Brown's claim for breach of fiduciary duty. In their brief, Appellants initially argue there was no evidence to support the claim for breach of fiduciary duty because Brown lacks standing to seek damages for injuries allegedly suffered by Mid–Atlantic. We agree.[5]

In his complaint, Brown alleged that Appellants "owed *plaintiff* [Brown] a fiduciary duty to operate the corporation in accordance with all applicable laws and in a proper business manner and to act in good faith and with due regard to [his] interest as a minority shareholder." [Emphasis added.] In addition to the two grounds urged on appeal, Brown enumerated other acts of self-dealing he alleged constituted a breach of fiduciary duty, stating "the *corporation* has been damaged and is entitled to judgment against the defendants for actual damages suffered and for other such relief as the court deems

---

4. This represents Brown's share of the proceeds if Mid–Atlantic had been sold according to the December 5, 1997 Letter of Intent.

5. Because we agree with Appellants' argument that any damages arising from a breach of fiduciary duty accrue to the corporation rather than to Brown individually, we need not address Appellants' other issues in support of their argument that the trial court erred in denying their motion for directed verdict on Brown's breach of fiduciary duty claim.

just and proper." [Emphasis added.] At the start of trial, the court granted Brown's oral motion to amend his complaint to include the allegation that Appellants' failure to go forward with the offer to purchase Mid–Atlantic's assets constituted a breach of fiduciary duty and that he suffered individual damages separate from that of the corporation. The trial court dismissed Brown's derivative claim on behalf of the corporation for failure to assert damages suffered by the corporation.

Brown did not appeal the dismissal of his derivative claim. On appeal, Brown asserts two factors giving rise to his individual claim for breach of fiduciary duty. First, he alleges Appellants participated in the structure of the proposed sale agreement which directed a large portion of the proceeds to Appellants in the form of consulting fees. Second, he alleges Appellants' failure to consummate the transaction in accordance with the TRO resulted in the ultimate loss of the entire proceeds to Brown. Appellants argue Brown's assertion of damages essentially are limited to the reduction in the value of his stock and nonpayment of dividends.

Brown testified that the December 5, 1997 Letter of Intent from CBA offered $1,000,000 to purchase "the stock and assets of" Mid–Atlantic, of which $300,000 represented consulting fees payable to Appellants and Silver as "the three principal producers." A second letter dated December 30, 1997 characterized the transaction as an asset purchase. On January 12, 1998, CBA sent a Letter of Intent to purchase the assets for $425,000 plus $300,000 to be paid in consulting fees to Appellants and Silvers.

Brown testified that with the first offer on December 5, 1997, he would have received 20% of the $700,000, or $140,000. He stated he was not happy about the large percentage of the proceeds going to pay consulting fees, but he would have recouped his investment in the sale and made an additional $40,000, and thus he was in favor of proceeding with the transaction. However, by the time of the January 12, 1998 letter, Brown stated he voiced his displeasure with the arrangement because he noticed that "[t]he purchase price had been reduced but the consulting fees had not." Brown stated he "wanted to have fair treatment for all five shareholders." Brown testified, "I realize[d] that some people had put some

effort in but I had put a hundred thousand dollars in this company and for somebody that had put what I later found out was seventy-five dollars to come away with a hundred and forty thousand dollars and I put in a hundred thousand and I was going to come away with maybe forty thousand just didn't seem right to me." Brown stated he paid $100,000 essentially "to finance their operation and they are lining their pockets with special deals[.]"

Brown also alleged Appellants breached a fiduciary duty by failing to consummate the purchase in accordance with the provisions of the TRO, which called for any proceeds to be paid into the corporation's account, not to the shareholders individually, to be later distributed according to the court's order.

William Worthy testified that he initially spoke to Altier, Mid–Atlantic's president, to inquire about purchasing the corporation's assets for CBA. Worthy stated he met with Altier, Appellants, and Silvers to negotiate a purchase price. Worthy said he was surprised to learn that Appellants had already formed another TPA called Preferred Group Administrators (PGA). Brown was apparently unaware of the new TPA and was not a participant. In their discussions, Worthy stated that he was planning to pay 70% for the assets and 30% in consulting fees for Mid–Atlantic, regardless of the total purchase price. Worthy testified, however, that Appellants "were more eager to sell Preferred Group Administrators first because of some claims problems," so he acquiesced and purchased PGA instead of Mid–Atlantic around February 1st and paid the proceeds directly to Appellants.

Worthy stated thereafter "there were many negotiations" with Appellants regarding the offer to purchase Mid–Atlantic's assets. Worthy stated that in the months after he purchased PGA, Mid–Atlantic's employees started leaving when they heard of the impending sale, and they began having problems with claims not being processed. Finally, in May 1998 his offer (based on the expected revenue then) was for "roughly three hundred fifty thousand dollars and we were going to buy the balance of that revenue basically [using] sort of the same formula and with an earn-out based on retention [of employee groups]." When he met with Appellants at closing, however,

Worthy discovered that Appellants had not told him that many of the groups he was purportedly purchasing had already signed on with other companies. Worthy stated Appellants would have had to know the groups were not coming to him because there was a sixty-day notice period in the contracts used by Mid–Atlantic. Worthy stated he gave a check for $50,000 to Silvers and/or Gibson, which they cashed within fifteen minutes, but he did not receive all of the accounts he expected.

 "The fiduciary obligation of dominant or controlling stockholders or directors is ordinarily enforceable through a stockholder's derivative action. . . ." 19 Am.Jur.2d *Corporations* § 2268, at 166 (1986). An action seeking to remedy a loss to the corporation is generally a derivative one. *Hite v. Thomas & Howard Co.*, 305 S.C. 358, 361, 409 S.E.2d 340, 342 (1991) (citations omitted), *overruled on other grounds by Huntley v. Young*, 319 S.C. 559, 560, 462 S.E.2d 860, 861 (1995). "A shareholder may maintain an individual action only if his loss is separate and distinct from that of the corporation. A shareholder's suit is derivative if the gravamen of his complaint is an injury to the corporation and not to the individual interest of the shareholder." *Id.; see also Todd v. Zaldo*, 304 S.C. 275, 278, 403 S.E.2d 666, 668 (Ct.App.1991) ("If an individual stockholder has suffered a particular loss due to mismanagement of a corporation then the stockholder may bring an action for his loss since it is his personal asset. But, this loss must be personal and not a loss of the corporation.").

 "If misconduct by the management of a corporation has caused a particular loss to an individual stockholder, the liability for the mismanagement is an asset of the individual stockholder. Of course, a suit based on the misconduct can be brought by the individual stockholder." *Ward v. Griffin*, 295 S.C. 219, 221, 367 S.E.2d 703, 703–04 (Ct.App.1988). "It becomes material, therefore, to inquire whether the acts of mismanagement charged to the directors affected the plaintiffs *directly*, or as their interests were submerged in the corporation whose assets were thus dissipated." *Stewart v. Ficken*, 151 S.C. 424, 427, 149 S.E. 164, 165 (1929).

An individual action is also allowed if the alleged wrong-doers owe a fiduciary relationship to the stockholder and full relief to the stockholder cannot be had through a recovery by the corporation. 19 Am.Jur.2d *Corporations* § 2268, at 167 (1986). In *Babb v. Rothrock,* our supreme court discussed an exception to the general rule that individual stockholders may not sue corporate directors for losses suffered by the corporation. 303 S.C. 462, 464–65, 401 S.E.2d 418, 419–20 (1991) (discussing exception relied on by the defendants found in *Thomas v. Dickson,* 250 Ga. 772, 301 S.E.2d 49 (1983)). The exception permits a stockholder to file an individual action for losses suffered by the corporation if the underlying reasons for requiring a derivative action are absent. *Id.* In *Thomas,* the Georgia Supreme Court stated:

> The reasons underlying the general rule [that shareholders must file derivative actions for losses suffered by the corporation] are that 1) it prevents a multiplicity of lawsuits by shareholders; 2) it protects corporate creditors by putting the proceeds of the recovery back in the corporations; 3) it protects the interests of all shareholders by increasing the value of their shares, instead of allowing a recovery by one shareholder to prejudice the rights of others not a party to the suit; and 4) it adequately compensates the injured shareholder by increasing the value of his shares.

301 S.E.2d at 51. Our court in *Babb* declined to adopt the *Thomas* exception finding that even if it were adopted, the parties in *Babb* could not maintain the action as an individual action because at least one of the reasons for the general rule was not absent. *Babb,* 303 S.C. at 464–65, 401 S.E.2d at 419–20 (finding the claims of corporate creditors would be jeopardized).

■ In this action, Brown alleged damages arising from the proposed sale which would divert $300,000 of the sales proceeds as consulting fees from the corporation to Stewart, Gibson, and Silvers. Brown further alleged damages arising from Appellants' failure to consummate the transaction in accordance with the TRO resulting in a greatly reduced sales price to the corporation. We find Brown's assertions are limited to damage to the corporation. Thus, Brown did not suffer individual damages, apart from the damage to the corporation.

Furthermore, Brown may not rely on the *Thomas* exception. As a result of the damage to the corporation, Brown suffered a reduction in the value of his stock. The damage to Brown as a stockholder, however, was shared by all of the stockholders including Silvers and Altier, who were dismissed from this action. Permitting Brown to maintain his action as an individual action would not protect the interests of all stockholders because the diminution in the value of the stock was suffered by all of the stockholders. Thus, the reasons for requiring a derivative action described in *Thomas* were not absent. Pursuant to *Babb*, where the reasons are not absent, we must rely on the general rule that individuals may not sue corporate directors or officers for losses suffered by the corporation. *Babb*, 303 S.C. at 464–65, 401 S.E.2d at 419–20. *Cf. Hite*, 305 S.C. at 361–62, 409 S.E.2d at 342 (holding a minority shareholder's causes of action for breach of fiduciary duty and negligent mismanagement did not have to be brought in a shareholder's derivative suit because the alleged reduction in the minority shareholder's percentage of corporate control was separate and distinct from any general diminution in value of corporate stock).

We hold the trial court erred in denying Appellants' motion for a directed verdict as to Brown's claim for breach of fiduciary duty. Accordingly, the verdict on the breach of fiduciary duty cause of action is reversed.

## III. Evidentiary Rulings

Appellants next argue the trial court made numerous incorrect rulings regarding their objections to the evidence and the questions propounded by opposing counsel. They maintain the court's rulings constitute an abuse of discretion entitling them to a new trial on all causes of action. We disagree.

"The admission or exclusion of evidence is a matter within the sound discretion of the trial court and absent clear abuse, will not be disturbed on appeal." *Gamble v. Int'l Paper Realty Corp.*, 323 S.C. 367, 373, 474 S.E.2d 438, 441 (1996). To warrant reversal, the appellant "must show both the error of the ruling and resulting prejudice." *Recco Tape & Label Co. v. Barfield*, 312 S.C. 214, 216, 439 S.E.2d 838, 840 (1994).

Appellants point to numerous instances in the transcript where they contend testimony was improperly admitted because it was either irrelevant, without proper foundation, dealt with matters of law, was hearsay, or was in response to leading questions by opposing counsel. We have examined each of Appellants' alleged errors in turn and find no error warranting reversal as the court's rulings were either properly made or resulted in no prejudice to Appellants.

■ We note that among these alleged errors is Appellants' assertion that Brown's attorney improperly expressed his personal opinion about the credibility of Appellants' testimony during closing argument. Appellants contend that after they objected to the remark, the trial court failed to give the jury a curative instruction. We find no error preserved for our review in this regard. The trial court sustained Appellants' objection to the remarks, and Appellants did not thereafter move to strike or ask for a curative instruction. *See Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review."); *State v. Patterson*, 324 S.C. 5, 18, 482 S.E.2d 760, 766 (1997) (holding the alleged impropriety of closing argument was not preserved for review where the trial court sustained an objection by opposing counsel, but counsel did not move to strike or request a curative instruction). Accordingly, we hold Appellants are not entitled to a new trial based on any of the trial court's evidentiary rulings.

## IV. Jury Instructions

Throughout their brief, Appellants argue numerous errors allegedly committed by the trial court concerning the jury charge on Brown's causes of actions. Appellants contend that each of the individual errors as well as their cumulative effect entitle them to a reversal on all causes of action. They further assert the trial court committed reversible error by violating the provisions of Rule 51, SCRCP, by failing to adequately reveal the contents of her contemplated jury charge prior to closing arguments. We disagree.

It is not error to refuse a request to charge when the substance of the request is included in the general instructions. *Varnadore v. Nationwide Mut. Ins. Co.*, 289 S.C. 155, 160, 345 S.E.2d 711, 715 (1986). In reviewing jury charges for error, we construe the court's charge as a whole in light of the evidence and issues presented at trial. *Keaton ex rel. Foster v. Greenville Hosp. Sys.*, 334 S.C. 488, 497, 514 S.E.2d 570, 575 (1999). If the instructions of the trial court, construed as a whole, correctly state the law, there is no reversible error. *Marks v. I.M. Pearlstine & Sons*, 203 S.C. 318, 330, 26 S.E.2d 835, 839 (1943). To entitle an appellant to reversal, the trial court's instructions must be not only erroneous, but also prejudicial, and the enumeration of hypercritical exceptions will not suffice to overthrow a jury's verdict. *Arkwright Mills v. Clearwater Mfg. Co.*, 217 S.C. 530, 553, 61 S.E.2d 165, 175 (1950).

We have reviewed each of Appellants' allegations and find no reversible error in the trial court's charge to the jury. We conclude the court's instructions fairly set forth the applicable law in South Carolina. The charge as a whole was reasonably free from error and we discern no prejudice suffered by Appellants. We particularly note that, as to Appellants' arguments that the trial court erred in failing to instruct the jury on its proposed charges Nos. 4, 7, 9B, and 12, we find no error as the requested instructions were either unnecessary or already fairly covered in the trial court's general charge.

To the extent Appellants assert the trial court violated Rule 51 of the South Carolina Rules of Civil Procedure because she failed to properly advise counsel of the substance of her charge, we find this argument unavailing.

Rule 51, SCRCP provides:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their

arguments to the jury, but the court shall instruct the jury after the arguments are completed.

On appeal, Appellants contend that during the initial charging conference, the trial court postponed her decision on their requests to charge No. 2 (Breach of Fiduciary Duty—Permitted Activities), No. 2A (Employing Relatives), No. 4A (Shareholder's Right to Inspection), and No. 12 (Plaintiff's Negligence as a Defense), as well as its requests to charge the jury on nondisclosure and conflict of interest transactions.[6] Appellants state when court convened the next day, the trial court failed to advise them of the substance of the instructions to be given.

■ Our review of the record indicates that during the initial conference, the trial court stated she was not inclined to charge the jury on Appellants' requests to charge Nos. 2 & 2A, but that if she did it would be in another form. As to No. 4A, the court stated if she charged it, it would be from the Code section. The court extensively discussed No. 12 with counsel, stating she disagreed with counsel's characterization of the evidence and whether the charge was appropriate, but that she would review it further. The trial court stated she would "charge nondisclosure as a representation, but not necessarily in that form." When court convened the next day, Appellants' counsel asked the trial court whether she was going to charge nondisclosure as fraud, and that he had some proposed jury instructions if it was to be charged. The trial court informed counsel that she was still completing work on the charge, but believed she had sufficiently advised counsel of the proposed charge and had satisfied the requirements of Rule 51. Appellants' counsel did not specifically request a ruling on the other requests to charge that are now urged on appeal.

We find that, under the circumstances, the trial court adequately apprised the parties of the substance of her intended charge, and we discern no prejudice to Appellants in this regard. During the initial charging conference, the trial court

---

6. In view of our reversal of the trial court's denial of Appellants' motion for directed verdict on the breach of fiduciary duty claim, the charges relating to that cause of action are moot.

reviewed each of the proposed instructions seriatim and discussed her thoughts as to each one. The court additionally advised the parties that she planned to charge the jury on the elements of fraud, negligent misrepresentation, and breach of fiduciary duty; the definitions appropriate to the elements of fraud; and that the burden of proof for fraud was clear and convincing evidence. She advised the parties her standard charge included the burden of proof, evidence, weighing the credibility of witnesses, and the use of a deposition or prior inconsistent statement to impeach a witness. She also discussed the verdict form to be used. Accordingly, we find no reversible error in either the court's instructions to the jury or in the court's discussion of the charge with counsel prior to closing arguments.

## V. Election of Remedies

Appellants contend the trial court erred in permitting Brown to retain a remedy for breach of fiduciary duty in addition to an election for either fraud or negligent misrepresentation. In light of our reversal of the trial court's denial of the motion for a directed verdict on the breach of fiduciary duty cause of action, we decline to address this issue.

## VI. Appellants' Counterclaim

Appellants asserted a counterclaim against Brown for tortious interference with prospective contractual relations. They alleged Brown "filed this lawsuit and obtained the injunction with the purpose and intent of causing CBA's offer to be withdrawn." Appellants asserted that "[a]s a proximate and consequent result of [Brown's] interference," they lost the benefits of CBA's offer. They sought actual damages of "at least" $555,000 as well as punitive damages.

The elements of this cause of action are (1) intentional interference with prospective contractual relations, (2) for an improper purpose or by improper methods, and (3) resulting injury. *Crandall Corp. v. Navistar Int'l Transp. Corp.*, 302 S.C. 265, 266, 395 S.E.2d 179, 180 (1990). The trial court

56

granted Brown's motion for a directed verdict on the basis that a party's exercise of a legal right does not constitute an improper motive or an improper purpose. The court found Brown's institution of this lawsuit and the securing of a TRO was an attempt to protect his rights as an investor and shareholder and did not constitute an improper motive or an improper purpose.

We find no error as there is no evidence to suggest any purpose or motive by Brown other than the pursuit of the protection of his rights as a minority shareholder and investor in Mid–Atlantic. As to the TRO, we note that Appellants consented to its continuance when given the opportunity to challenge the initial TRO. In addition, the order provided that any party could move to amend, modify, or vacate the TRO with ten days notice, and there is no indication in the record that any such motion was thereafter made or denied by the trial court. *See, e.g., Webb v. Elrod,* 308 S.C. 445, 448, 418 S.E.2d 559, 561 (Ct.App.1992) ("The exercise in good faith of a legal right by a party to a contract affords no basis for an action by the second party for intentional interference with a contract even though the consequence of the exercise of the legal right by the first party is to cause a third party not to perform another contract with the second party."). Accordingly, we affirm the court's grant of a directed verdict on Appellants' counterclaim.

### VII. Cumulative Error

Appellants finally maintain that the errors described above require a new trial. Alternatively, they argue that if the individual errors identified by Gibson and Stewart are insufficient to warrant a new trial, then the cumulative effect of the many trial errors justifies reversal. In rebuttal, Brown asserts that "the number and sheer repetitiveness of [Appellants'] 64 cited errors does not equate to a cumulative effect that worked to deny them a fair trial and/or taint the jury's verdict in this case."

We note that Appellants previously filed a motion with this Court for an enlargement of the time in which to serve and file

their initial brief and "for permission to exceed the length limitation in their [brief] by 25 pages." This Court granted the motion for additional time and to exceed the page limitation. Upon reviewing Appellants' brief, however, we agree with Brown's observation that "an appeal is not an open invitation for factual interpretation, but rather a venue for review of real errors in legal judgment that can be deemed to cause prejudice to a party to the extent that they rise to the level of reversible error." Although we do not condone this exhaustive, shotgun approach to pursuing an appeal, we have individually and collectively reviewed all of Appellants' errors. *See Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (stating "the process of 'winnowing out weaker claims on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.") (quoting *Jones v. Barnes*, 463 U.S. 745, 751–51, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). We conclude Appellants are not entitled to a new trial based on cumulative error.

## CONCLUSION

We affirm the trial court's denial of a directed verdict, JNOV, or new trial on Brown's causes of action for fraud and negligent misrepresentation. In addition, we find no reversible error in the numerous objections Appellants raise on appeal regarding the trial court's admission of evidence and the court's instructions to the jury on all causes of action. We reverse the trial court's denial of a directed verdict on Brown's breach of fiduciary duty cause of action and therefore set aside the jury verdict on that cause of action. Finally, we affirm the trial court's granting of a directed verdict on Appellants' counterclaim.

**AFFIRMED IN PART and REVERSED IN PART.**

HEARN, C.J., and HOWARD, J., concur.