Terry W. OSBORN, Plaintiff,

v.

UNIVERSITY MEDICAL ASSOCIATES OF THE MEDICAL UNIVERSITY OF SOUTH CAROLINA; Medical University of South Carolina; Health Sciences Foundation of the Medical University of South Carolina; Pharmaceutical Education & Development Foundation of the Medical University of South Carolina; James B. Edwards; and Thomas P. Anderson, Defendants.

No. CIV.A. 2–01–4002–18.

United States District Court, D. South Carolina, Charleston Division.

Aug. 11, 2003.

Carl Muller, Greenville, S.C., for plaintiff.

Joseph C. Good, Jr., Susan Wall, Todd W. Smyth, Thomas White, Charleston, S.C., for defendant.

## ORDER

NORTON, District Judge.

This matter is before the court on defendants' respective Motions for Summary Judgment. The court heard oral arguments on February 13, 2003.

### I. Summary Judgment Standard

Summary judgment shall be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party carries its burden of showing that there is an absence of evidence to support a claim, then the non-moving party must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial. *Id.* at 324–25, 106 S.Ct. 2548. An issue of fact is "genuine" when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "material" only if establishment of the fact might affect the outcome of the lawsuit under the governing substantive law. *Id.* When determining whether there is an issue for trial, the court must view the inferences to be drawn from the underlying facts in the

light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir.1990).

## II. Factual Background

This action arises out of the termination of plaintiff, Terry W. Osborn ("Osborn"), from his employment as President and Chief Executive Officer of the Pharmaceutical Development Center ("PDC"), the operational element of the Pharmaceutical Education and Development Foundation of the Medical University of South Carolina ("PEDF"). Primarily, Osborn claims that defendants[1] fraudulently breached his Employment Agreement (the "Agreement") with the PDC and that following his termination, they failed to properly compensate him in accordance with the terms of that Agreement. (Pl.'s Mem. at 1; Pl.'s Amended Compl. at 2–3).

Osborn was hired by the PDC on January 5, 1999 following a national search for an individual to serve as its Chief Executive Officer and President. In 1997, the PDC had conducted a financial evaluation and decided to pursue the goal of attaining a profitable commercial status. With this goal in mind, the PDC recruited Osborn in December 1998, and Osborn accepted an offer of employment and entered into the Employment Agreement at issue with the PDC on January 5, 1999. Among other things, the Agreement provided Osborn with the responsibility of moving the PDC "up to the next business level," and more specifically, it charged him with the duty to "grow the revenues and develop sufficient professional staff to profitably expand the enterprise into a 'for profit' operation." (Pl.'s Ex. 1). The PDC failed to reach profitability after two years under Osborn's direction. Osborn was terminated on January 12, 2001 by a letter from James B. Edwards, then the Chairman of the Board of Directors of the PEDF. (Pl.'s Ex. 7). This letter did not provide an explanation for Osborn's termination, but it implied that Osborn's removal was not "for cause" because it specifically dis-

---

1. Osborn has filed suit against six separate defendants: (1) the Medical University of South Carolina ("MUSC"), a research agency of the State of South Carolina; (2) University Medical Associates ("UMA"), which was created in 1991 as a § 501(c)(3) non-profit corporation whose members are faculty physicians of the MUSC College of Medicine and which serves as the practice plan for the faculty of the College of Medicine; (3) the Health Sciences Foundation ("HSF"), a § 501(c)(3) tax-exempt organization with the purpose of supporting education, research, patient care, and other programs of MUSC; (4) the Pharmaceutical Education and Development Foundation of MUSC ("PEDF"), organized in 1994 as a § 501(c)(3) non-profit corporation with a focus on scientific research and development in the field of pharmaceuticals and providing an educational experience in such areas for students in the MUSC College of Pharmacy; (5) James B. Edwards, former President of MUSC and the Chairman of the Board of Directors of the PEDF; and Thomas P. Anderson, the Chief Executive Officer of the HSF and a voluntary member of the Board of Directors of the PEDF. (Defs. HSF and Anderson's Mem. at 1).

It should also be noted at this early point that the court will make no distinction between the PDC and defendant PEDF for liability purposes. Indeed, the PDC is not a named party to this suit, and defendant PEDF's counsel has admitted that the PDC was merely an operational unit of the PEDF and further conceded that Osborn was an employee of defendant PEDF. (Def. PEDF's Mem. at 2, 23). Further illustrative of the direct privity existing between the PDC and defendant PEDF is the fact that, unlike all other named corporate defendants, the PEDF makes no attempt to argue that it did not enter into a contract with Osborn. Accordingly, although this Order at times makes varying reference to both terms, the terms "PDC" and "PEDF" are considered by the court to be interchangeable.

cussed the implementation of Osborn's severance benefits under the terms of his Agreement.[2]

Nevertheless, despite being dismissed for reasons other than "for cause," Osborn alleges that he received only a portion of the severance benefits he was entitled, and he further alleges that additional bargained-for forms of compensation were withheld from him altogether.[3] As a result, Osborn filed suit against defendants alleging a total of six causes of action: (1) fraud in the inducement; (2) negligent misrepresentation; (3) breach of contract accompanied by a fraudulent act; (4) breach of contract; (5) breach of implied covenant of good faith and fair dealing; and (6) a violation of the South Carolina Payment of Wages Act, S.C.Code Ann. § 41–10–10 *et seq.* (West 2003).

All six defendants have filed for summary judgment on each of Osborn's claims. Additionally, defendants have filed five counterclaims against Osborn for which they seek summary judgment in their favor: (1) breach of fiduciary duty; (2) breach of contract; (3) breach of contract accompanied by a fraudulent act; (4) negligent misrepresentation; and (5) fraud and/or fraudulent concealment. In response, Osborn argues that summary judgment is improper with respect to all of these claims. (Pl.'s Mem. at 41–43).

## III. Discussion

### a. Preliminary Issues Concerning the Liability of the Various Corporate Defendants—MUSC, HSF and UMA

■ Other than the PEDF, the remaining corporate defendants in this action (i.e., HSF, MUSC, and UMA) argue that they were neither Osborn's employer nor did they have any contractual privity with Osborn, and that they may not be held liable for any of the causes of action alleged. In response, Osborn argues that liability extends to each of these respective defendants under the "instrumentality doctrine," or "alter ego" theory. This doctrine generally provides that, "when a lender controls the business decisions and actions of its borrower, the borrower becomes the instrument or alter ego of the lender." *Peoples Fed. Savings & Loan Ass'n v. Myrtle Beach Golf & Yacht Club,* 310 S.C. 132, 425 S.E.2d 764, 774 (Ct.App. 1992).

■ This doctrine is but a variation of the "piercing the corporate veil" principle, in which a court may in certain instances disregard the corporate device of limited liability where it has been misused by its owners. Therefore, under this doctrine, "[a] corporation may become liable for the debts of another corporation when it misuses that corporation by treating it, and by using it, as a mere business conduit for the

**2.** Osborn's Employment Agreement clearly provided that if he was "terminated for any reason except 'for cause[,]'" he would be provided with a severance package. The amount of that severance package (which forms part of the present dispute) depended upon the date of Osborn's termination. For instance, in the event that Osborn was terminated "during the period prior to [the] second anniversary of [his] start date [i.e., January 5, 2001]" then Osborn would receive severance in the equivalent of "six months" of his current salary. (Pl.'s Ex. 1). However, were Osborn terminated subsequent to the second anniversary of his original start date, he would "be provided with a severance package equivalent to twelve months" of his current salary. (*Id.*).

**3.** With regard to this additional compensation, Osborn alleges that defendants breached the terms of his Employment Agreement by refusing to pay him "a bonus to which he was entitled ... [as well as] the value of his ownership interest in the drug company [i.e., the PDC]." (Pl.'s Amended Compl. at ¶ 20).

purposes of the dominant corporation." *Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098, 1102 (5th Cir.1973). As stated by the Fifth Circuit in its *Krivo* decision, the rationale for holding a dominant corporation liable for a subservient corporation's debts is that, "since the dominant corporation has misused the subservient corporation's corporate form by using it for its ... own purposes, the debts of the subservient corporation are in reality the obligations of the dominant corporation." *Id.* at 1102–03. Where this is the case, "courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require." *Id.* at 1103 (quoting *United States v. Reading Co.*, 253 U.S. 26, 63, 40 S.Ct. 425, 64 L.Ed. 760 (1920)). However, before this doctrine may be applied, two elements must be present: "First, the dominant corporation must have *controlled* the subservient corporation, and second, the dominant corporation must have *proximately caused* [the] plaintiff harm through misuse of this control." *Id.* at 1103 (emphasis added).

■ In assessing whether the "instrumentality doctrine" should extend liability in this action to MUSC, HSF, and UMA, the court concludes that the issue of "control" is dispositive. And what is required to establish the necessary "control" is clear:

[I]n cases resulting in "instrumentality" liability for the creditor [i.e., the dominant corporation], the facts have unmistakably shown that the subservient corporation was being used to further the purposes of the dominant corporation and that the subservient corporation in reality had *no separate independent existence of its own.* This absence of an independent corporate purpose is most apparent in those cases in which the dominant corporation, to further its own corporate purposes, either organized or acquired the subservient corporation.

*Id.* at 1105 (emphasis added). "In summary[,] .... the control required for liability under the 'instrumentality' rule amounts to *total domination* of the subservient corporation, to the extent that the subservient corporation manifests no separate interests of its own and functions *solely* to achieve the purposes of the dominant corporation." [4] *Id.* at 1106 (emphasis added).

Such language makes it clear that under the appropriate circumstances "court[s] do not hesitate to ignore the corporate form in those cases where the corporate device has been misused by its owners." *Id.* at 1102. However, the burden of proof is substantial and courts within this jurisdiction have made it clear that they are generally reluctant to "disregard the integrity of the corporate entity." *Sturkie v. Sifly*, 280 S.C. 453, 313 S.E.2d 316, 319 (S.C.Ct. App.1984). Indeed, the instrumentality theory will "not apply even in the presence of 'total domination' without some misuse of control by the dominant corporation resulting in injustices or inequitable consequences." *Peoples Fed. Savings & Loan Ass'n*, 425 S.E.2d at 774 (citing *Krivo*, 483

---

4. Taking this logic even further, the *Krivo* court (on which plaintiff heavily relies) held that:

The control necessary to invoke what is sometimes called the "instrumentality rule" is not mere majority or complete stock control but *such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own* and is but a business conduit for its principal.

*Krivo*, 483 F.2d at 1106 (5th Cir.1973) (quoting 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 43 (1963)) (emphasis added).

F.2d at 1106). Regardless, Osborn argues that in addition to his direct employer, the PEDF, each of the remaining corporate defendants—MUSC, HSF, and UMA—respectively exercised sufficient control over the PDC so as to warrant extending liability to them for the PDC's alleged actions or omissions.

With regard to MUSC, Osborn argues that "the PDC was created solely to serve the purposes of MUSC ...." (Pl.'s Mem. at 33). To buttress this point, Osborn directs the court to the PDC's Articles of Incorporation, which provide that the PDC is "organized and shall at all times be operated for the purposes of MUSC." (Pl.'s Ex. 27, at p. 9). Additionally, Osborn argues that Edwards, then the President of MUSC, testified that the PDC's purpose was that of "serving the Medical University."[5] (Pl.'s Mem. at 34).

With respect to the HSF, Osborn points out that along with MUSC, any profits made by the PDC would, in some portion, go directly to HSF. (Pl.'s Mem. at 34; Hewitt Dep. at 120–21). Furthermore, Osborn argues that excerpts from both the PDC and the HSF's corporate minutes indicated that HSF and its Chairman, Bill Hewitt ("Hewitt"), were "directing operations of the PDC ...." (Pl.'s Mem. at 35). For instance, in asserting that Hewitt and the HSF had a powerful role in deciding the fate of the PDC, Osborn quotes the April 18, 2000 minutes of the HSF Board:

> Mr. Hewitt stated .... it was decided that the best thing to do was to get to validation as soon as possible, package the building and business [i.e., the PDC] for sale, and try to get out with as much money as we can as quickly as possible.

(Pl.'s Mem. at 36; Pl.'s Ex. 33 at p. 11). Therefore, Osborn argues that the HSF Board exercised a high degree of control over the PDC, and regularly made decisions about its funding and operations.

Finally, as to UMA, Osborn alleges that "UMA was not left out of this control over the PDC." (Pl.'s Mem. at 37). For example, citing to a UMA–PEDF Personnel Agreement, Osborn points out that "all employees of the PDC were both paid by UMA and considered employees of UMA." (Pl.'s Mem. at 37; Pl.'s Ex. 36). Osborn further alleges that UMA's control over the PDC is emphasized by the fact that, as President and CEO of the PDC, he was an employee of UMA.[6]

Despite plaintiff's arguments regarding MUSC, HSF, and UMA, the court concludes that Osborn has failed to provide any genuine issue of fact as to whether the PDC was effectively operated as an "alter ego" or "instrumentality" of any of these corporate defendants. The court certainly acknowledges that the relevant case law cited by Osborn provides that evidence of

---

**5.** When questioned about problems in finding potential investors for the PDC, Edwards testified as follows:

Q. Okay any other options considered other than the possibility of a sale or a shutdown of the facility?

A. But as I recall, those options were difficult *given the nature of the PDC, as a nonprofit entity, really there for the sole purpose of serving the Medical University.* It made it very difficult to bring in outside investors—you know, to be an investor. How do you have an investor in an entity like that?

(Edwards Dep. at 115–16) (emphasis added).

**6.** With regard to this specific point, Osborn directs the court to several documents. First, Osborn notes that his "Employee Separation Notice" was issued by UMA. He also makes reference to a letter concerning his retirement benefits issued by MUSC which indicated that he was employed by UMA, and he further notes that his Human Resources Policies and Procedures Manual was issued by UMA. (Pl.'s Ex. 37, 38A, 38B).

a corporation being used for the "sole purpose" of another dominant entity is probative as to whether an "instrumentality" situation is present. The test for extending liability, however, does not end there. Misuse of purpose and *total control* must also be shown, and this is where the evidence in this case, even when viewed in a light most favorable to Osborn, falls short. Although it may be stated—by reference to the Articles of Incorporation of the PDC and certain portions of Edwards' deposition testimony—that the PDC was established for the purpose of serving MUSC, this fact alone does not in and of itself establish that MUSC exercised "total control" over the PDC. In similar fashion, Osborn's specific references to various actions taken by, or on behalf of, HSF and UMA also fail to depict the type of scenario required for this court to disregard the PDC's corporate form. On the contrary, during all time periods relevant to this action the PDC had (or was in the process of establishing) separate facilities, a separate Board of Directors, a separate Chief Executive Officer and President, and separate employees. These uncontested facts do much to express why this court is unable to conclude that the PDC had "no separate mind, will or existence of its own[,]" *Krivo,* 483 F.2d at 1106 (quoting 1 W. Fletcher *Cyclopedia of the Law of Private Corporations* § 43 at 204–05), despite the fact that in some respects it may have been operating as a "subservient corporation" in its individual or collective dealings with MUSC, and, to a much lesser degree, HSF and UMA.

Accordingly, because the evidence does not sufficiently indicate that either MUSC, HSF or UMA exercised total control over the operations of the PDC, these entities may not be held liable for any of the contractual obligations or any other of the alleged actions or omissions of defendant PEDF, Osborn's direct employer.

### b. Preliminary Issues Concerning the Liability of Anderson and Edwards as Individually–Named Defendants

Defendants Anderson and Edwards argue that, "to the extent that Plaintiff's claims against [them] are based upon [their] membership on the board of directors for the PEDF, [they] are immune from suit, absent proof of any *willful* or *grossly negligent conduct.*" (Def. Anderson's Mem. at 17; Def. Edwards' Mem. at 21). In making this argument, both Anderson and Edwards point to the South Carolina Nonprofit Corporation Statute, which in part provides that directors of nonprofits are immune from suit for ordinary negligence. Specifically, § 33–31–834(a) of this statute states that:

All directors, trustees, or members of the governing bodies or not-for-profit cooperatives, corporations, associations, and organizations ... are immune from suit arising from the conduct of the affairs of these cooperatives, corporations, associations, or organizations. This immunity from suit is removed when the conduct amounts to willful, wanton, or gross negligence.

S.C.Code Ann. § 834(a) (West 2003). Of course, there is no disputing that the PEDF was, at all times relevant to this action, a qualifying nonprofit organization under section 501(c)(3) of the Federal Internal Revenue Code; therefore, the only determination to be made is whether there is any evidence in the record which would indicate that Anderson and/or Edwards were grossly negligent or acted in a willful or wanton manner towards Osborn in their capacity as voluntary directors of the PEDF.

■ South Carolina courts have recognized "gross negligence" only when the

defendant has failed to exercise a slight degree of care. *Pilot Indus. v. Southern Bell Tel. & Tel. Co.*, 495 F.Supp. 356, 362 (D.S.C.1979) (citing *Wilson v. Etheredge*, 52 S.E.2d 812, 52 S.E.2d 812 (1949)). "Gross negligence is 'the intentional, conscious failure to do a thing that is encumbent [sic] upon one to do, or the doing of a thing intentionally that one ought not to do.'" *Id.* (quoting *Ford v. Atl. Coast Line R.R.*, 169 S.C. 41, 168 S.E. 143, 147 (S.C. 1932)).

■ Alternatively, willful or wanton behavior, although similar in character to gross negligence, tends to require somewhat of a higher degree of culpability. *See* 18 S.C. Jur. Negligence § 9 (noting that the terms "willful" and "wanton" are synonymous with the term "reckless," and therefore represent a "higher degree of negligence than gross negligence"). The test for determining whether behavior is wanton or willful was set forth in *Rogers v. Florence Printing, Co.*, 233 S.C. 567, 106 S.E.2d 258, 263 (1958). In that case, the South Carolina Supreme Court held that,

> The test by which a tort is to be characterized as reckless, wilful or wanton is whether it has been committed in such a manner or under such circumstances that a person of ordinary reason or prudence would then have been conscious of it as an invasion of the plaintiff's rights.

*Rogers*, 106 S.E.2d at 263. The Court went on to describe such conduct as being characterized by a "present consciousness of wrongdoing." *Id.* It further noted that although several descriptive litmus tests had been employed in expressing the type of intent required (i.e., "conscious failure to observe due care," "conscious indifference to the rights of others," and "gross

disregard of the rights of the person injured"), the "common denominator of these expressions is the test . . . that at the time of [a defendant's] act or omission to act the [defendant] be conscious, or chargeable with consciousness, of his wrongdoing." *Id.* at 264.

■ What Osborn alleges as the most egregious conduct on the part of Anderson and Edwards relates to a cellular telephone call made to Osborn on December 22, 2000. Osborn alleges that during this phone call, which was conducted just prior to the second anniversary of his hiring (i.e., January 5th), "the Defendants under the most egregious possible circumstances, all in order to swindle [him] out of the equity and benefits to which he was entitled under the contract[,] . . . . attempted to extort an agreement out of [him] by threatening to fire him if he refused to go along." (Pl.'s Mem. at. 23). The facts surrounding this phone call, however, simply do not support plaintiff's allegation that Anderson or Edwards were engaged in any conscious wrongdoing during this particular exchange, or at any other time.

Although the details of this telephone conversation vary, a few significant aspects of this communication are immediately apparent. First, in the light most favorable to Osborn, Edwards informed Osborn that if he did not agree to extend the anniversary date of his employment to January 15th, he would be terminated immediately. (Edwards Dep. at 114; Osborn Dep. at 231). Second, the timing of this exchange was critical to both Osborn and the PDC because under the terms of his Agreement, Osborn was entitled to additional compensation on January 5th, the second anniversary of his hiring.[7] Third, Osborn, Ed-

---

**7.** As previously noted, Osborn's Employment Agreement provided that if he was terminated *following* the second anniversary of his hiring, he would be entitled to twelve months of severance pay (as opposed to six months) as

wards, and Anderson were all aware that any extension of Osborn's anniversary date could alter Osborn's overall compensation package, as originally set forth in his Agreement. And finally, it is clear that although Anderson was a "party" to this telephone conversation, he did not even speak to Osborn on December 22, 2000; rather, the record indicates that the discussion was between Edwards, Osborn, and Rob Robertson, an attorney representing the interests of the PDC. (Osborn Dep. at 232, Tr. of Oral Arg. at 42, 45).

It is apparent that Osborn was not in a favorable position during this December 22, 2000 conversation. As is well-established, however, South Carolina has adopted the doctrine of employment at-will. *Prescott v. Farmers Tel. Coop., Inc.,* 335 S.C. 330, 516 S.E.2d 923, 925 (1999) ("South Carolina has long recognized the doctrine of employment at-will."). Accordingly, the PDC had the power to terminate its relationship with Osborn "without incurring liability for good reason, no reason, or bad reason." *Culler v. Blue Ridge Elec. Coop., Inc.,* 309 S.C. 243, 422 S.E.2d 91, 92 (1992) (citing *Ludwick v. This Minute of Carolina, Inc.,* 287 S.C. 219, 337 S.E.2d 213, 214 (1985)). There is nothing in the record leading the court to assume that Anderson, Edwards, or Osborn were unaware of this fact.[8] Furthermore, as representatives of the PDC, Anderson or Edwards could have at any time, and for any reason, sought to persuade Osborn to renegotiate or amend the terms of his Agreement. Osborn was, of course, free to reject any such offer, and indeed, in the light most favorable to him, the court must assume that Osborn did reject Edwards'

offer to renegotiate the terms of the Employment Agreement. (Osborn Dep. at 234). None of this, however, supports a finding that Anderson or Edwards were engaged in any conscious wrongdoing regarding Osborn's employment with the PDC.

In attempting to establish that such an intent nonetheless existed, Osborn argues that Edwards did not have the authority to terminate him at the time of the December 22nd telephone conversation. Osborn asserts that at the time of the conversation, Edwards could not terminate him because the Board of Directors had not yet voted on the issue as required under the PDC's Corporate Bylaws. Specifically, plaintiff's counsel argues that,

> [k]nowing they had no authority to terminate Osborn, the Defendants nevertheless undertook to defraud him by engaging in a telephonic effort to deceive him into changing his Agreement so that they could keep him around (thus maintaining the marketability of the PDC at a critical time as it was being evaluated by potential investors), yet still deprive him of the benefits of his Agreement— benefits for which he had worked more than two years to earn.

(Pl.'s Mem. at 19). Rather, Osborn points out that only after the attempts were made to persuade him to alter his Agreement, did the Board "ratify" Edwards' actions on January 15, 2001. (*Id.*). It is Osborn's position that Anderson and/or Edwards were attempting to "swindle" him out of his benefits under a false threat of termination. The facts of the record simply do not bear this out.

well as a two-percent (as opposed to one-percent) equity share in the PDC.

**8.** In fact, the PDC's Corporate bylaws provided that:

> Any Foundation officer may be removed with or without cause, at any time at any Board meeting at which a quorum is present by vote of two thirds (2/3) of all voting Directors then serving on the Board.
> (Pl.'s Ex. 15, p. 7).

The focus of the inquiry is whether, in the light most favorable to Osborn, Anderson or Edwards had a sense of "conscious wrongdoing" in their dealings with Osborn. Edwards' testimony clearly indicates that he believed he had the authority to terminate Osborn on December 22, 2000. For instance, Edwards testified that the Board's dissatisfaction with the status of the PDC precipitated his telephone conversation with Osborn. Specifically, Edwards noted that:

> It was at the Executive Committee meeting. We took a consensus of the board, and I never do anything without the board's total support or majority support, and the board decided that it was time to do something about Terry, and so Rob Robertson had Terry [Osborn's] phone number. He had gotten him on the phone, and we talked on the phone about ... if we could get him to extend the anniversary date of his employment .... And he blew up a little bit on the phone .... And after he cooled down a little bit, I told him once again that he was not giving me any alternative but to terminate him right then .... And we came back in and told the board, and the board ... voted that we had done the right thing ....

(Edwards Dep., at p. 113–16, 337 S.E.2d 213). Such testimony indicates that Edwards was, at the very worst, negligent with respect to the issue of whether he had the authority to terminate Osborn during their December 22nd telephone conversation. There is, however, no indication that either Anderson or Edwards acted towards Osborn with any sense of "conscious wrongdoing." Indeed, even were the court to presume that Edwards did not have the formal authority under the PDC's Corpo-

rate bylaws to terminate Osborn on December 22, 2000, the result is the same; the factual record simply does not support the contention that either Anderson or Edwards behaved in a way that could rise to the level of willful or wanton conduct or gross negligence in their dealings with Osborn. Accordingly, this court finds that there is no factual or legal basis for holding Anderson or Edwards individually liable for any action or omission attributable to the PDC.

### c. Plaintiff's Specific Claims [9]

#### 1. Fraud in the Inducement

■■■ First among Osborn's claims is the allegation that "Defendants committed fraud in the inducement by misrepresenting critical facts about the PDC at the time [he] was hired." (Pl.'s Mem. at 1). A party asserting a claim for fraud in the inducement to enter into a contract must establish: (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. *Brown v. Stewart,* 348 S.C. 33, 557 S.E.2d 676, 680 (Ct.App.2001). A failure to prove any of these elements if is fatal to recovery. *Id.* Additionally, "[f]raud cannot be presumed; it must be proved by clear, cogent, and convincing evidence." *Foxfire Village, Inc. v. Black & Veatch, Inc.,* 304 S.C. 366, 404 S.E.2d 912, 917 (Ct.App. 1991).

■■■ Specifically, Osborn argues that during his recruitment he was told that the

---

**9.** For the reasons described above, defendant PEDF remains the only party subject to liability for Osborn's specific claims. Accordingly, only the PEDF's arguments are referenced in the ensuing discussion.

PDC was financially stable, possessed a state of the art facility very near completion and ready for validation, and that he would receive an equity interest in the enterprise which would provide him with a "significant accumulation" of wealth. (*Id.* at 1–13). According to Osborn, however, when he began running the PDC he quickly discovered that none of these things were true. (*Id.* at 5). In fact, Osborn contends that upon his hire, the facility was "utterly useless," the financial condition of the PDC was "utterly abysmal" and, moreover, although defendants had promised him with an "equity, or an ownership position ... in the PDC[,]" they "had no intention of providing him with such an interest." (*Id.* at 1, 6). In short, Osborn claims that he "stepped into a nightmare." (*Id.* at 9).

In support of summary judgment on this claim, defendant PEDF generally asserts that any representations made to Osborn constituted mere expressions of intention or statements concerning the future, neither of which are actionable as fraud. For instance, the PEDF argues that, "these alleged 'representations' fall well short of what is required by South Carolina law to make them actionable, but rather they amount only to an expression of intention .... [and] Osborn has presented no evidence to support the contention that the defendants knowingly or recklessly made a false representation at the time they hired [him]." (Def. PEDF's Mem. at 9). After reviewing the factual record in the light most favorable to Osborn, the court agrees.

From the outset, it is evident that Osborn's fraud claim falls short with respect to his alleged equity interest in the PDC. Osborn argues that the PDC agreed in the Employment Agreement that he "would receive an ownership interest in the [PDC] ... after two years," and "represented

that the value of this ownership interest was substantial, with 'profitable. revenues' in excess 'of $20 million expected in 5 years." (Pl.'s Amended Compl. at 4). Yet even were it presumed that defendants falsely represented to Osborn that he would receive an equity interest in the PDC, his fraud claim nevertheless fails because, as alleged, the claim ignores certain statements regarding the PDC's intentions. For instance, although the Employment Agreement states that Osborn could expect to gain tremendously from an equity share in the enterprise, this representation was by no. means framed in terms of a guarantee. On the contrary, the Agreement provided that:

> You will be provided a pool of ten percent (10%) equity in the PDC for you and your management team. Your portion will be one half of this equity pool, or five per cent [sic] (5%), which will vest one percent (1%—one fifth total) per year. *While the value of the PDC in five years is unknown, the PDC Board would expect* profitable revenues in excess of $20 million which would create a valuation of the PDC of sufficient size to provide significant wealth accumulation for you and your management team.

(Pl.'s Ex. 1) (emphasis added). Such language clearly expresses that it was the PDC's intention that Osborn profit from his equity interest, but an intention alone is not actionable as fraud. As the South Carolina Court of Appeals has pointed out, a "false representation" is but one of the elements needed to establish fraud. In *Winburn v. Ins. Co. of North America,* 287 S.C. 435, 339 S.E.2d 142, 145 (Ct.App. 1985), the court held that:

> To establish fraud, there must first be a false representation. The false representation, however, must be one of fact as distinguished from the mere expres-

sion of an opinion. *As a general rule, fraud cannot be predicated on a statement that constitutes an expression of an intention.*

(internal citations and quotations omitted) (emphasis added).

Osborn argues that defendant PEDF had no intention of providing him with an equity interest. (Pl.'s Mem. at 1). The language of the Agreement, however, clearly shows otherwise. It expresses that the PDC intended that Osborn receive such an interest in the event that the enterprise became profitable under his direction. Such expressions of intent cannot, as a matter of law, amount to actionable fraud.

The court, however, cannot resolve Osborn's fraud claim on defendants' arguments concerning the equity interest alone. As noted above, Osborn also alleges that misrepresentations were made concerning the PDC's facility and its financial condition as well. Nevertheless, summary judgment with regard to Osborn's entire fraud claim remains appropriate because he has failed to establish a genuine issue of fact as to whether any defendant acted with fraudulent intent in making any misrepresentation to him. Rather, the evidence in the light most favorable to Osborn at best expresses that defendants simply were not fully aware of the actual condition of the PDC prior to Osborn's hiring. For example, Osborn points to certain admissions made by both Anderson and Edwards concerning the condition of the PDC and its facility, but these statements do not establish a fraudulent intent towards Osborn during his recruitment, nor at any other time.[10] On the contrary, this evidence at the most establishes that Edwards and Anderson may have been negligent or, at the least, that they had merely expressed their opinions about the PDC in their recruitment of Osborn—neither of which would constitute fraud. *Brown v. Stewart,* 557 S.E.2d at 681 (holding that "fraud requires the conveyance of a known falsity"); *Winburn,* 339 S.E.2d at 145 (holding that "fraud cannot be predicated on a statement that constitutes an expression of an intention"). Such a showing not only fails to establish any inference of fraud under a preponderance of the evidence standard, but it falls dreadfully short under the appropriate standard of proof for establishing fraud, that of clear and convincing evidence. Accordingly, even when viewed in a light most favorable to him, Osborn's arguments fail to meet the standard for fraud under South Carolina law.

10. For instance, Osborn states that, "Anderson learned that the Facility was not validatable *after* Osborn started working ...." (Pl.'s Mem. at 8) (emphasis added). Of course, this statement begs the question of how Anderson could have acted fraudulently with respect to the condition of the PDC during Osborn's recruitment if he was not fully aware of that condition until after Osborn was already employed. Additionally, Osborn points towards certain admissions by Edwards concerning the nature of the Facility, but as with Anderson's statements, Edwards' deposition testimony does not reveal any actionable fraudulent intent:

Q. Would you agree that you were basically expecting to move into a facility that was ready to go for production within a couple of months after Dr. Osborn arrived? That is what were you expecting to happen?

A. Generally, yes.

Q. *So circumstances changed quite a bit from the time Dr. Osborn accepted the job and the time he showed up; would you agree?*

A. *Yes.*

(Pl.'s Mem. at 9; Edwards Dep. at 46–47) (emphasis added). Again, if "circumstances changed" it is inconceivable that Edwards could have acted fraudulently (e.g., with knowledge or reckless disregard of the falsity) prior to Osborn's hiring.

## 2. Negligent Misrepresentation

 In addition to his claim for fraud, Osborn makes a claim for negligent misrepresentation based on the same underlying facts. Negligent misrepresentation requires a plaintiff to prove that: (1) the defendant made a false representation, (2) the defendant had a pecuniary interest in making the representation, (3) the defendant owed a duty of care to see that he communicated truthful information, (4) the defendant breached that duty by failing to exercise due care, (5) the plaintiff justifiably relied on the representation, and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation. *Brown v. Stewart*, 557 S.E.2d at 680–81. A duty to exercise reasonable care in giving information exists when the defendant has a pecuniary interest in the transaction. *Winburn*, 339 S.E.2d at 146.

 Defendant PEDF's arguments for summary judgment with respect to Osborn's negligent misrepresentation claim virtually mirror those offered in support of denying his claim for fraud. (Def. PEDF's Mem. at 13) Indeed, given that a claim for negligent misrepresentation "cannot ordinarily be based on unfulfilled promises or statements as to future events[,]" one would expect, at least initially, that summary judgment on this claim is in fact justified. *Fields v. Melrose Ltd.*

*P'ship*, 312 S.C. 102, 439 S.E.2d 283, 285 (Ct.App.1993); *see also Winburn*, 339 S.E.2d at 147 (holding that "[e]vidence of a mere broken promise is not sufficient to prove negligent misrepresentation any more than it is sufficient to prove fraudulent misrepresentation"). Nevertheless, the circumstances surrounding Osborn's hiring create issues of fact so as to preclude this result.

Osborn argues for the *first time* in his Memorandum in Opposition of Summary Judgment that several "critical facts about the PDC" were misrepresented by defendants prior to his hiring—namely, that the PDC was in stable financial condition and that a new, state-of-the-art facility would be operational very shortly after his arrival. However, as previously discussed, although Osborn was allegedly assured by defendants that the PDC was generally a healthy enterprise, upon hire he discovered what Osborn's counsel describes as "a nightmare." (Pl.'s Mem. at 6–9; Osborn Dep. at 260–61). If Osborn's testimony is to be believed (as it must at this stage of the litigation), and if the conditions at the PDC were as "abysmal" as he alleges, defendant PEDF arguably *should have been aware* of these conditions prior to Osborn's hiring and during ·his recruitment, thus paving the way for a denial of summary judgment as to this claim.[11] *See*

---

11. No doubt recognizing this fact, defendant PEDF has argued on Reply that because Osborn alleged only misrepresentation as to his equity interest (as opposed to the actual overall health of the PDC) in his Amended Complaint, he cannot now attempt to create an issue of fact in is Opposition Memorandum. (Def. PEDF's Reply at 2). In support of this argument, defendant PEDF directs the court to one of its previous decisions, *Witt v. American Trucking Ass'ns*, 860 F.Supp. 295 (D.S.C. 1994). In that case this court held that:

> A motion for leave to amend is not a vehicle to circumvent summary judgment. [A]fter the parties ha[ve] conducted discovery and a pending summary judgment motion ha[s] been fully briefed, the court should be strongly disinclined to grant leave to amend, particularly where no good cause can be shown for the delay.

*Witt*, 860 F.Supp. at 305. PEDF argues that were the court to view Osborn's additional arguments as constructively amending his already once-amended Complaint, it should prevent such an attempt in accordance with its ruling in *Witt*. This argument carries little weight, however, because the facts presented by the instant action are easily distinguishable

*Brown v. Stewart,* 557 S.E.2d at 681 (noting that "a key difference between fraud and negligent misrepresentation is that fraud requires the conveyance of a known falsity, while negligent misrepresentation is predicated upon transmission of a negligently made false statement").

A review of the facts in a light most favorable to Osborn reveals that the PEDF could be seen to have been negligent in its representations to Osborn regarding the condition and overall health of the enterprise prior to Osborn's hiring. Summary judgment is therefore denied as to Osborn's claim for negligent misrepresentation.

### 3. Breach of Contract and Breach of Contract Accompanied by a Fraudulent Act

#### i. Breach of Contract

Osborn claims that the PDC "breached the Agreement by failing and refusing to pay [him] a bonus to which he was entitled, his severance package and retirement benefits to which he was entitled, and the value of his ownership interest in the drug company." (Pl.'s Amended Compl. at 3). In response, defendant PEDF argues that (1) Osborn was guaranteed only one bonus under the terms of his Employment Agreement, which he received; (2) he was not entitled to any additional severance because he was employed "almost immediately after his termination"; and (3) he cannot demand an equity interest in the PDC because "[i]t is axiomatic that one cannot have an equity interest in a nonprofit entity." (Def. PEDF's Mem. at 14,

24, 25). These arguments are addressed separately.

#### a. Bonus

■ With respect to any compensation due to Osborn in the form of a "bonus," the Employment Agreement provided that:

2. Your targeted bonus will be thirty-five percent (35%) of your annual salary based on achievement of annual PDC revenue and income targets Recognizing start-up uncertainties, you are guaranteed a minimum bonus of $50,000.00 for 1999.

(Pl.'s Ex. 1, at p. 1).

Citing to this provision, defendant PEDF contends that Osborn was entitled to only one guaranteed bonus under the terms of the Agreement, which it argues he received. (Def. PEDF's Mem. at 14). The PEDF further argues that "[a]ll other bonuses were based upon performance and were discretionary." (*Id.*). This argument simply fails to remove all issues of fact. Indeed, Osborn has testified that even though he was entitled to a discretionary bonus in June or July of 2000, the PDC told him it simply could not pay it. (Pl.'s Mem. at 40; Osborn Dep. at 59). If this testimony is believed, genuine issues of material fact remain.

Furthermore, there is no doubting that under the terms of the Agreement, future bonuses were "based on achievement of annual PDC revenue and income targets." (Pl.'s Ex. 1, at 1). Defendant PEDF has not offered a sufficient explanation as to how these requirements were not met and, as such, issues of fact remain and sum-

from those involved in *Witt.* Whereas in this action Osborn has already amended his complaint on a previous occasion and makes additional factual arguments in his Opposition Memorandum, the plaintiff in *Witt* sought to amend his complaint by adding a cause of

action *nearly six years* following the filing of the original complaint. Accordingly, despite defendant PEDF's arguments to the contrary, the court is not persuaded that its previous ruling in *Witt* provides any precedential authority applicable to this action.

mary judgment as to this particular claim is denied.

### b. Severance Benefits

Osborn's Employment Agreement further provided that he would receive six months' severance pay if he was terminated (for any reason other than "for cause") prior to the second anniversary of his hiring, and twelve months' severance pay if he were terminated following this anniversary date. The Agreement further provided in Article 15 that these severance pay entitlements would become "null and void upon [Osborn's] *acceptance of hire* by another organization . . . ." (Pl.'s Ex. 1 at p. 3) (emphasis added).

Defendant PEDF argues that this "acceptance of hire" clause was triggered when Osborn accepted part-time consultation work with Canadian Medical Laboratories, Ltd. on or about February 7, 2001, thereby ending any obligation on its behalf to pay Osborn continued severance. (Def. PEDF's Mem. at 24). In support of this argument, the PEDF notes that, "under South Carolina law, a contract must be construed according to the terms the parties have used, and the terms are to be taken in their plain, ordinary and popular sense." (*Id.*). According to the PEDF, the plain and ordinary meaning of the term "hire" makes no distinction between an employee or an independent contractor. The PEDF cites to Black's Law Dictionary, which defines "hire" as "[c]ompensation for the use of a thing, or for labor or services." Black's Law Dictionary 729 (6th ed.1990).

In response to this proposed interpretation for the term "hire," Osborn points towards evidence that the intended meaning of the "acceptance of hire" clause within Article 15 was full-time employment, as opposed to "part-time" employment or consulting work. As Osborn points out, Gary Kreutz, who negotiated and drafted the terms of Osborn's Agreement on behalf of the PDC, has testified that the Employment Agreement's "acceptance of hire" clause was intended to cut-off Osborn's entitlement to severance benefits only in the event that he became a "full-time employee of another company." (Kreutz Dep. at 59; Pl.'s Ex. 4). And Osborn argues that although he accepted consulting work with another company soon after his termination from the PDC, it was "part-time consulting work." (Pl.'s Mem. at 42).

Of course, the parties' disagreement on this issue requires an interpretation of the term "acceptance of hire" according to the standard principles of construction under South Carolina law. The principles to be applied are well-known and straightforward. An action to construe a written contract is an action at law, and in construing a contract, the primary objective of the court is to ascertain and give effect to the intention of the parties. *Southern Atl. Fin. Servs., Inc. v. Middleton*, 349 S.C. 77, 562 S.E.2d 482, 484–85 (Ct.App.2002). In making such a determination, the court must first look solely to the language of the contract. "If the contract's language is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required and the contract's language determines the instrument[']s force and effect." *Id.* However, if the court determines that the language of the contract is ambiguous, then "parol evidence is admissible to ascertain the true meaning and intent of the parties." *Koontz v. Thomas*, 333 S.C. 702, 511 S.E.2d 407, 411 (Ct.App.1999). An ambiguous contract is one that can be understood in more ways than just one or is unclear because it expresses its purpose in an indefinite manner. *Id.*

In the present action, it appears that defendant PEDF would have

this court find that the term "acceptance of hire" unambiguously encompasses consulting work or "part-time" employment, yet reach such a conclusion by relying on extrinsic evidence (i.e., Black's Law Dictionary).[12] Such a finding would, of course, misconstrue the law of contractual interpretation. South Carolina law permits a court to consult a dictionary in interpreting contract terms. "However, a court looks to a dictionary only where the terms are deemed to be *ambiguous.*" *Sunex Int'l, Inc. v. Travelers Indem. Co. of Ill.*, 185 F.Supp.2d 614, 617 (D.S.C.2001). Furthermore, summary judgment is proper in an action presenting a question concerning the construction of a written contract only "where the intention of the parties regarding the legal effect of the contract may be gathered from its four corners." *Id.* And such a conclusion may only be reached where a court determines as a matter of law that the terms of a contract are unambiguous. In other words, by referencing a preferred meaning of the term "acceptance of hire" as included in a dictionary, defendant PEDF has effectively conceded that this term is ambiguous.

■ However, irrespective of defendant PEDF's use of a dictionary in advocating that "acceptance of hire" refers to part-time consulting work, the court finds this clause to be ambiguous. From the face of the Agreement, it is unclear as to what level of employment Article 15 refers. In the context in which the Agreement was drafted, the term "acceptance of hire" could plausibly refer to "full-time employment"—the status Osborn carried with the PEDF upon the start of his employment—

just as it could refer to any form of "part-time" employment, as defendant PEDF argues. Furthermore, the primary objective in construing any contract is to ascertain the intention of the parties, and this almost necessarily requires an inquiry into the purpose which the parties sought to accomplish. And indeed, in applying common sense and good faith in construing the term "acceptance of hire" in the manner and with the purpose it was used in Osborn's Agreement, this court is unable to conclude that, as a matter of law, the parties intended that Osborn's severance benefits terminate in the event that he found any "part-time" employment; this conclusion seems particularly appropriate in light of the full-time status Osborn held with the PDC.

■ A finding of ambiguity in the term(s) of Osborn's Employment Agreement also necessitates a denial of summary judgment on Osborn's claim for additional severance benefits. South Carolina law clearly provides that although "it is a question of law for the court whether the language of a contract is ambiguous[,]" the meaning of an ambiguous term is not a matter for the court to decide. *S.C. Dep't of Natural Res. v. Town of McClellanville*, 345 S.C. 617, 550 S.E.2d 299, 302–03 (2001). Rather, "[o]nce the court decides the language is ambiguous, evidence may be admitted to show the intent of the parties .... [And][t]he determination of the parties' intent is then a question of fact." *Id.*

#### c. Equity Interest in the PEDF

Osborn additionally claims that the PDC breached his Agreement by withholding

---

**12.** Specifically, defendant PEDF argues that: There is no ambiguity in the terms used in the Employment Agreement .... If the parties had intended that Article 15 apply if Plaintiff became an employee of another organization, they would have used those terms. Moreover, 'hire' is defined as '[c]ompensation for the use of a thing, or for labor or services.' (Def. PEDF's Mem. at 25) (citing Black's Law Dictionary 729 (6th ed.1990)).

his ownership (equity) interest in the company. Although the terms of the Agreement clearly provide Osborn with "equity in the PDC," defendant PEDF argues that "as a matter of law, there can be no equity in a non-profit organization." (Def. PEDF's Mem. at 26). The PEDF further asserts that even if an ownership interest could exist in a nonprofit entity, Osborn is not owed anything from his interest in the PEDF because its liabilities currently exceed its assets. (Def. PEDF's Mem. at 27).

Both the PEDF and Osborn have retained experts for assistance in dealing with these issues. Dr. Charles Alford, III ("Alford"), Osborn's retained expert, has provided a methodology which Osborn argues is sufficient for computing the fair value of the equity in the PDC. Defendant PEDF, however, has moved to exclude Dr. Alford from testifying under the limitations set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). (*See* Defs.' Mot. to Exclude Pl.'s Expert). Specifically, defendant PEDF argues that Dr. Alford's testimony is unreliable and does not assist the trier of fact in understanding the evidence or in determining an issue of fact in this case. (*Id.*). Because the admissibility of Dr. Alford's testimony bears on the equity issue as it pertains to Osborn's breach of contract claim, the court will not address Osborn's equity claim at this time. Instead, the court will defer any resolution of this issue until after hearing the parties' arguments concerning (1) whether one may acquire an ownership interest in a nonprofit entity, and (2) if so,

whether Dr. Alford's testimony concerning such an interest is admissible.

**d. Material Issues of Timing Relating to Plaintiff's Breach of Contract Claim**

█ Osborn's contractual claims to an alleged equity interest and additional severance pay hinge upon whether Osborn was terminated before or after the second anniversary date of his hiring. As alluded to earlier, defendant PEDF argues that Osborn orally agreed in a cellular phone conversation to extend this anniversary date from January 5 to January 15, 2001, yet was terminated on January 12, 2001. (Def. PEDF's Mem. at 5). The importance of this phone call, of course, lies in fact that the second anniversary date of Osborn's hiring was the vesting point for his entitlement to additional severance pay and a greater equity share in the PDC under the terms of the Agreement.

In light of the fact that Osborn has testified that no such agreement was reached and, moreover, that no consideration was provided for the alleged agreement, there clearly remains an issue of fact as to whether or not he was terminated after the second anniversary of his hiring. Accordingly, despite defendant PEDF's arguments to the contrary, there are no timing concerns which might otherwise preclude consideration of any of Osborn's contractual claims, and summary judgment as to these claims remains unjustified.[13]

**ii. Breach of Contract Accompanied by a Fraudulent Act**

Osborn additionally alleges that defendant PEDF acted fraudulently in breaching his Employment Agreement. In response to this separate claim, defendant

---

**13.** Of course, this ruling does not apply to Osborn's breach of contract claim as it relates to his alleged equity interest; as stated, reso-

lution of this issue is held in abeyance until oral arguments on this specific issue have been presented.

PEDF recycles its previous arguments regarding Osborn's fraud claim. Specifically, it asserts that "the claim must fail [because] .... [t]here simply is no evidence to support Plaintiff's claim that a fraudulent act was committed by the Defendants." (Def. PEDF's Mem. at 15).

In order to establish a claim for breach of contract accompanied by a fraudulent act, the plaintiff must establish three elements: (1) breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach. *Conner v. City of Forest Acres, J.C.*, 348 S.C. 454, 560 S.E.2d 606, 612 (2002). With regard to the third element of this claim, the standard of proof of clear and convincing evidence is applicable.[14]

When considering fraudulent intent as it relates to the breaching of a contract, however, courts are given fairly wide discretion in determining its existence:

> The fraudulent act is any act characterized by dishonesty in fact or unfair dealing. Fraud, in this sense, assumes so many hues and forms, that courts are compelled to content themselves with comparatively few general rules for its discovery and defeat, and allow the facts and circumstances peculiar to each case to bear heavily upon the conscience and judgment of the court or jury in determining its presence or absence.

*Id.* at 672, 560 S.E.2d 606. Such a standard is, to say the least, amorphous. Indeed, this broad language has moved the Fourth Circuit to observe that, "[i]n most cases, the courts have affirmed submission of [breach of contract accompanied by a fraudulent act] claims to the jury ...." *Edens v. Goodyear Tire & Rubber Co.*, 858 F.2d 198, 201 (4th Cir.1988). Nevertheless, "[a]lthough the cases involving breach of contract accompanied by a fraudulent act do not present an easy formula for defining a 'fraudulent act,' it is clear that the fraudulent act alleged must be an act done with the intent to deceive." *Save Charleston Found. v. Murray*, 286 S.C. 170, 333 S.E.2d 60, 66 (Ct.App.1985). Therefore, evidence of fraud, of course, remains essential, and "[t]he courts occasionally have sustained demurrers to complaints attempting to state a claim for breach of contract accompanied by a fraudulent act where plaintiffs have failed to allege fraudulent intent or a fraudulent act." *Edens*, 858 F.2d. at 201.

Despite plaintiff's allegations and arguments to the contrary, the evidence in this action fails to present any issue of fact as to whether a fraudulent act accompanied any alleged breach of Osborn's Employment Agreement. At best, the factual record shows that defendants attempted to persuade Osborn to renegotiate his Agreement. The fact that this attempt was made under a threat of termination and included terms less favorable than Osborn's original Agreement is irrelevant. As noted earlier, Osborn was well aware that he could be terminated at any time for any reason, for no reason, or even for bad reason. Furthermore, all parties were free to try to renegotiate the terms of Osborn's Agreement at any time. Indeed, as indicated in Osborn's April 19, 2000 "Performance Review," Osborn himself attempted to persuade defendants to amend the Agreement to include more favorable terms, but this

---

**14.** The real benefit of a cause of action for breach of contract accompanied by a fraudulent act is the attendant availability of punitive damages, and only actual damages can be recovered unless there is clear and convincing evidence of a fraudulent act accompanying the alleged breach of contract. *See Vann v. Nationwide Ins. Co.*, 257 S.C. 217, 185 S.E.2d 363, 364 (1971).

offer was rejected after "serious consideration." (Pl.'s Ex. 10 at 3). This offer was briefly described in that Performance Review in the following manner:

Finally, you have asked us to consider the acceleration of both more generous severance benefits and equity vesting schedule. We have given this serious consideration and have decided that we must reaffirm the intent of our original agreement and its terms. We cannot agree with this request.

(*Id.*). Osborn's efforts in this regard undercut any doubts that he was treated unfairly, taken by surprise, or was the subject of some deceitful scheme.

Accordingly, Osborn has failed to provide any evidence of fraud accompanying the alleged breaching of his Employment Agreement on defendant PEDF's behalf, or for any other defendant originally a party to this action. Indeed, as with Osborn's fraud in the inducement claim, the evidence fails in this instance to support an issue of fact as to the existence of a fraudulent act under a preponderance of evidence standard, much less under a standard of proof of clear and convincing evidence. Summary judgment in defendant PEDF's favor must therefore be granted.

### 4. Breach of Implied Covenant of Good Faith and Fair Dealing

 Although implied covenants are not favored in the law, "there exists in every contract an implied covenant of good faith and fair dealing." *Williams v. Riedman,* 339 S.C. 251, 529 S.E.2d 28, 35 (Ct. App.2000). Under South Carolina law, however, it is clear that tort remedies are not available for breach of implied covenant of good faith and fair dealing in the employment context. *Id.* at 36 (holding that only contract damages are available for a defendant's breach of an implied covenant of good faith). Accordingly, although it is not presently clear whether Osborn would seek damages in tort for this claim, were he to do so, such damages are barred from recovery as a matter of law.

### 5. South Carolina Payment of Wages Act

In support of summary judgment on Osborn's claim brought under the South Carolina Payment of Wages Act, S.C.Code Ann. § 41–10–10 *et seq.,* defendant PEDF argues that "severance pay, profit sharing, or equity payments" are not "wages" under the Act, and are therefore not covered. (Def. PEDF's Mem. at 19). The term "wages" is defined to mean:

all amounts at which labor rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or other method of calculating the amount and includes vacation, holiday, and sick leave payments which are due to an employee under any employer policy or employment contract. Funds placed in pension plans or profit sharing plans are not wages subject to this chapter.

S.C.Code Ann. § 41–10–10(2).

It is clear that severance payments are not covered under the Payment of Wages Act because they were expressly excluded from the definition of "wages" by the South Carolina Legislature in 1990. *See* Annotations to S.C.Code Ann. § 41–10–10 (stating that "the 1990 Amendment deleted in subsection (2) 'and severance' following 'sick leave' "). Prior to this 1990 Amendment, § 41–10–10 provided that, " '[w]ages' includes vacation, holiday, sick leave, *and severance payments* which are due to an employee under any employer policy or employment contract." *Allan v. Sunbelt Coca–Cola Bottling, Co., Inc.,* No. 88–CP–18–936, 1989 WL 299243, at *2 (S.C.Ct. Com.Pl. Aug. 15, 1989) (emphasis added).

Accordingly, Osborn's claims for any additional severance benefits are not covered by the Payment of Wages Act. *Dumas v. InfoSafe Corp.*, 320 S.C. 188, 463 S.E.2d 641, 645 (Ct.App.1995) (holding that "[a]ll rules of statutory construction are subservient to the one that the legislative intent must prevail").

 Defendant PEDF additionally argues that because "profit sharing plans" are excluded from "wages" under the Payment of Wages Act, Osborn's equity interest claim is barred. (Def. PEDF's Mem. at 19). This argument, however, is not convincing. Profit sharing plans are implemented with a purpose of sharing an entity's profits with its employees. Typically, a profit sharing plan, in the plain sense of the term, sets forth a definite formula allocating both the contributions and distributions for each employee participant, with the contributions being tax-deductible. For instance, Black's Law Dictionary defines a profit sharing plan as "[a] plan established and maintained by an employer to provide for the participation in the profits of the company by the employees or their beneficiaries." Black's Law Dictionary 1211 (6th ed.1990).

Although defendant PEDF would have the court interpret Osborn's alleged equity interest in the PDC as a "profit sharing plan," there is no indication in the Agreement of such an intention. Indeed, the term "profit sharing plan" is never employed. Rather, from the terms of the Agreement itself, Osborn was intended to possess a five-percent (5%) ownership interest in the company, with the other corporate investors presumably possessing the remaining interest. Because there is no indication from the Agreement itself that Osborn was to be provided with a "profit sharing plan," in the traditional sense of that term, issues of fact remain as to whether Osborn's alleged equity interest falls under the Payment of Wages Act.

Finally, there is the question of Osborn's alleged additional bonus for the 2000 fiscal year. Defendant PEDF does not dispute that this bonus would be included under the Payment of Wages Act. Rather, the PEDF merely relies here on its previous arguments that Osborn was not entitled to an additional bonus. As such, summary judgment is denied for the reasons stated with respect to Osborn's contractual claim for unpaid bonus sums.

### c. Defendants' Counterclaims

### i. Breach of Fiduciary Duty

Defendants claim that during his tenure as CEO and President of the PDC, Osborn breached his fiduciary duty to the organization. Specifically, they argue that Osborn's alleged "failure to implement spending controls, .... [his] poor management decisions, his refusal to move to Charleston [as allegedly required under the Agreement,] and his clandestine attempts to gain control of the company were all actions adverse to the PDC's interests." [15] (Def. PEDF's Mem. at 30–31).

---

**15.** The factual scenarios allegedly underlying each of these claims are as follows. First, as to Osborn's failure to implement spending controls, the PEDF points to numerous indiscretions concerning Osborn's spending habits as CEO. For instance, the PEDF claims that he: (1) spent the company's money on "expensive dinners for himself and his friends"; (2) "charged his own personal credit card fees to the company"; (3) "charged the PDC for his taxi fares, air travel and associated expenses for his trips home to Chicago ....";　(4) "used the company vehicle for personal use"; (5) "signed his own expense checks without oversight"; and (6) "entertained people at the local strip clubs on his company credit card." (Def. PEDF's Mem. at 29). Second, the PEDF argues that the Employment Agreement provided that Osborn "was to move to Charleston and be 'headquartered'

However, the relatively malleable legal standard underlying a cause of action for breach of fiduciary duty mitigates against granting summary judgment to defendants. Indeed, South Carolina courts "have carefully refrained from defining the particular instances of fiduciary relationship in such a manner that other and perhaps new cases might be excluded and have refused to set any bounds to the circumstances out of which a fiduciary relationship may spring." *Brown v. Pearson*, 326 S.C. 409, 483 S.E.2d 477, 484 (Ct.App.1997). Moreover, as plaintiff's counsel has pointed out, the question of "whether [an] agent or employee acted disloyally during a particular apportioned period or task also is a question for the jury in most cases. In deciding whether an agent or employee acted disloyally, the jury must focus upon the particular circumstances of the case." *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 518 S.E.2d 591, 596 (1999). Summary judgment is therefore denied.

### ii. Breach of Contract and Breach of Contract Accompanied by a Fraudulent Act

Defendants next contend that "Osborn's acceptance of severance benefits while he was employed was clearly a breach of contract ... [and] his failure to notify the PDC of his other employment was dishonest, fraudulent and patently unfair." (Def. PEDF's Mem. at 33). However, given that issues of fact exist with regard to whether the Employment Agreement's "acceptance of hire" clause applied to part-time consulting work, the same issues of fact surely exist here. Indeed, if "part-time consulting" was not contemplated as constituting "acceptance of hire" un-

der the terms of the Agreement, defendants' breach of contract action would fail. Moreover, given that there is a legitimate dispute as to the meaning of "acceptance of hire," Osborn arguably could not have acted with fraudulent intent in withholding knowledge of his consulting work from defendants. Summary judgment is therefore not appropriate in favor of defendants' claims for breach of contract and breach of contract accompanied by a fraudulent act.

### iii. Negligent Misrepresentation/Fraudulent Concealment

In addition to their breach of contract claims, defendants base these causes of action on Osborn's acceptance of severance payments while he was performing consulting work and his attendant failure to reveal that fact to the PDC. Specifically, they argue that, "Osborn owed a duty to ... convey full and truthful information about his employment status[, and] .... [h]e admits he failed to do so which was negligent, at best; fraudulent at worst." (Def. PEDF's Mem. at 33–34). Summary judgment is improper for these claims for the same reasons described above. If an issue of fact exists as to whether Article 15's "acceptance of hire" clause refers to "full-time employment" as opposed to "part-time consulting" work, then issues of fact also exist with respect to these claims. In the event that "full-time employment" is determined to be the intended meaning of the term, then Osborn presumably would have been under no duty to inform defendants of his relationship with Canadian Medical Labs, and he would have had every right to accept, and, indeed, demand additional severance payments under the terms of the Agreement. An issue of fact

there .... [yet][h]e did not do this." (Def. PEDF's Mem. at 29). And finally, the PEDF claims that Osborn "set his sights on gaining control of the company for himself and a

group of investors he assembled" despite the fact that he was also charged with trying to sell the PDC "for the best price it would bring." (Def. PEDF's Mem. at 30).

therefore exists with regard to whether Osborn was negligent in withholding this information from defendants; it is much less probable that he was fraudulent in doing so. Summary judgment on these claims is therefore denied.

## IV. Conclusion

In light of the foregoing discussion, it is therefore,

**ORDERED**, that defendants MUSC, HSF and UMA are dismissed from this action for want of contractual privity with plaintiff.

**IT IS FURTHER ORDERED**, that defendants Anderson and Edwards are dismissed from this action in the absence of evidence supporting an inference of any willful, wanton, or grossly negligent conduct on their part.

**IT IS FURTHER ORDERED**, that defendant PEDF's Motion for Summary Judgment be **GRANTED** as to plaintiff's claim for fraudulent inducement, breach of contract accompanied by a fraudulent act, and breach of implied covenant of good faith and fair dealing.

**IT IS FURTHER ORDERED,** that defendant PEDF's Motion for Summary Judgment be **DENIED** with respect to plaintiff's claims for negligent misrepresentation, breach of contract, and pursuant to the South Carolina Payment of Wages Act.

**IT IS FURTHER ORDERED**, that defendants' Motions for Summary Judgment are **DENIED** with respect to their counterclaims.

**IT IS FURTHER ORDERED** that Osborn's breach of contract claim for defendant PEDF's failure to provide an alleged equity ownership interest in the entity is

held in abeyance until a hearing on this specific issue has been conducted.

**AND IT IS SO ORDERED.**